**Volume 1 of 2**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: THE EXXON VALDEZ,

GRANT BAKER; SEA HAWK
SEAFOODS, INC.; COOK INLET
PROCESSORS, INC.; SAGAYA CORP.;
WILLIAM MCMURREN; PATRICK L.
MCMURREN; WILLIAM W. KING;
GEORGE C. NORRIS; HUNTER CRANZ;
RICHARD FEENSTRA; WILDERNESS
SAILING SAFARIS; SEAFOOD SALES,
INC.; RAPID SYSTEMS PACIFIC LTD.;
NAUTILUS MARINE ENTERPRISES,
INC.; WILLIAM FINDLAY ABBOTT,
JR.,
              *Plaintiffs-Appellees,*

                  v.

EXXON MOBILE CORP; EXXON
SHIPPING CO.,
              *Defendants-Appellants.*

No. 04-35182

D.C. No.
CV-89-00095-HRH

In re: THE EXXON VALDEZ,

GRANT BAKER; SEA HAWK
SEAFOODS, INC.; COOK INLET
PROCESSORS, INC.; SAGAYA CORP.;
WILLIAM MCMURREN; PATRICK L.
MCMURREN; WILLIAM W. KING;
GEORGE C. NORRIS; HUNTER CRANZ;
RICHARD FEENSTRA; WILDERNESS
SAILING SAFARIS; SEAFOOD SALES,
INC.; RAPID SYSTEMS PACIFIC LTD.;
NAUTILUS MARINE ENTERPRISES,
INC.; WILLIAM FINDLAY ABBOTT,
JR.,

           *Plaintiffs-Appellants,*

              v.

EXXON MOBILE CORP; EXXON
SHIPPING CO.,

           *Defendants-Appellees.*

No. 04-35183

D.C. No.
CV-89-00095-HRH

ORDER
AMENDING
OPINION AND
DISSENTS TO
ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Alaska
H. Russel Holland, Chief Judge, Presiding

Argued and Submitted
January 27, 2006—San Francisco, California

Filed December 22, 2006
Amended May 23, 2007

Before: Mary M. Schroeder, Chief Judge,
James R. Browning and Andrew J. Kleinfeld, Circuit Judges.

Order;
Dissent to Order by Judge Kozinski;
Dissent to Order by Judge Bea;
Per Curiam Opinion;
Dissent by Judge Browning

## COUNSEL

Walter Dellinger, O'Melveny & Myers, LLP, Washington, D.C., and John F. Daum, O'Melveny & Myers LLP, Los Angeles, California, for the defendants-appellants, cross-appellees.

Brian B. O'Neill, Faegre & Benson, Minneapolis, Minnesota, and David C. Tarshes, Davis, Wright, Tremaine, LLP, Anchorage, Alaska, for the plaintiffs-appellees, cross-appellants.

## ORDER

IT IS ORDERED THAT:

The opinion in *In re Exxon Valdez*, 472 F.3d 600 (9th Cir. 2006) is amended as follows: On page 621, delete the first full paragraph commencing with "There is also a limit on the law of the case doctrine . . ." and concluding with " . . . may not generally be used as part of the calculation of harm."

With that amendment, the panel has voted to otherwise deny the petition for panel rehearing.

The petition for panel rehearing is DENIED.

The full court was advised of the petition for rehearing en banc. A judge of the court called for a vote on whether to rehear the matter en banc. The matter failed to receive a majority of votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. 35.[1]

The petition for rehearing en banc is DENIED.

---

KOZINSKI, Circuit Judge, dissenting from the order denying the petition for rehearing en banc:

For two centuries, maritime law has protected ship owners from liability for punitive damages based solely on the fault of captain and crew. *See* Thomas J. Schoenbaum, Admiralty & Maritime Law § 5-17 (2005) ("[A]dmiralty cases deny punitive damages in cases of imputed fault."). The Supreme Court first erected this bulwark in *The Amiable Nancy*, 16 U.S. 546, 558-59 (1818), explaining that a ship owner can't

---

[1]Judges Wardlaw, Tallman, and Ikuta were recused in this matter and took no part in the voting.

be subject to "exemplary damages" for the actions of its agent if the owner is "innocent of the demerit of this transaction, having neither directed it, nor countenanced it, nor participated in it in the slightest degree."

Dutifully following *The Amiable Nancy*, we held in *Pacific Packing & Navigation Co.* v. *Fielding*, 136 F. 577, 580 (9th Cir. 1905), that punitive damages are unavailable against a ship owner for the reckless conduct of the captain. We abruptly changed course in *Protectus Alpha Navigation Co.* v. *North Pacific Grain Growers, Inc.*, 767 F.2d 1379 (9th Cir. 1985), and held that, under maritime law, punitive damages are available against an owner for the actions of his agent who "was employed in a managerial capacity and was acting in the scope of employment." *Id.* at 1386 (quoting Restatement (Second) of Torts § 909).[1]

The conflict between *Protectus Alpha* and *Pacific Packing* washed ashore in *In re the Exxon Valdez* (*Valdez I*), 270 F.3d 1215 (9th Cir. 2001).[2] Following *Protectus Alpha*, and consigning *The Amiable Nancy* and *Pacific Packing* to the dustbin of history, the district court instructed the jury that Exxon was responsible for the reckless acts of the captain if he was

---

[1]While taking no account of *The Amiable Nancy*, *Protectus Alpha* pointed to state cases imposing vicarious punitive liability based upon "the reality of modern corporate America," 767 F.2d at 1386, but nothing has changed in the relationship between ship owner and captain that would justify importing this innovation into maritime law, *see* Schoenbaum, Admiralty & Maritime Law § 5-17 ("[S]tate tort law reforms do not affect admiralty punitive damage awards."). The captain has always borne the responsibility for safeguarding his crew and third parties, and this hasn't changed in modern times. *See, e.g.*, *Boudoin* v. *J. Ray McDermott & Co.*, 281 F.2d 81, 84-85 (5th Cir. 1960); *Northern Queen Inc.* v. *Kinnear*, 298 F.3d 1090, 1096 (9th Cir. 2002).

[2]While this conflict didn't come to the full court's attention until Exxon's petition for rehearing after *In re the Exxon Valdez* (*Valdez II*), 472 F.3d 600 (9th Cir. 2006) (per curiam), we can consider en banc any issue in *Valdez I* under *Kyocera Corp.* v. *Prudential-Bache Trade Services, Inc.*, 341 F.3d 987, 995-96 & n.13 (9th Cir. 2003) (en banc).

"employed in a managerial capacity while acting in the scope of [his] employment." *See Valdez I*, 270 F.3d at 1233 (internal quotations omitted). Once the jury found that the captain acted recklessly, it was also required to find that Exxon acted recklessly. On appeal, the panel recognized that *Protectus Alpha* conflicts with *Pacific Packing*; at that point, it was duty-bound to call this case en banc. *See United States* v. *Hardesty*, 977 F.2d 1347, 1348 (9th Cir. 1992) (en banc) (per curiam). Instead, it scuttled the en banc process and held that *Protectus Alpha*'s imposition of punitive damages based on vicarious liability is now the maritime rule in our circuit. *See Valdez I*, 270 F.3d at 1235-36.[3]

This decision puts us at loggerheads with every other circuit that has considered this issue. In *United States Steel Corp.* v. *Fuhrman*, 407 F.2d 1143 (6th Cir. 1969), *cert. denied*, 398 U.S. 958 (1970), the Sixth Circuit followed *The Amiable Nancy* and *Pacific Packing* in holding that a ship owner cannot be held liable for punitive damages "unless it can be shown that the owner authorized or ratified the acts of the master either before or after the accident . . . [or] the acts complained of were those of an unfit master and the owner was reckless in employing him." *Id.* at 1148. The Fifth Circuit followed the same course in *In re P&E Boat Rentals, Inc.*, 872 F.2d 642 (5th Cir. 1989). In rejecting *Protectus Alpha*, it observed that admiralty courts, going back to *The Amiable Nancy*, have held that punitive damages are unavailable based

---

[3]In overruling *Pacific Packing*, the panel relied exclusively on *Pacific Mutual Life Insurance Co.* v. *Haslip*, 499 U.S. 1 (1991). *See Valdez I*, 270 F.3d at 1235-36. The panel badly missed the mark. *The Amiable Nancy* and *Pacific Packing* held that punitive damages, based on vicarious liability, are not available under maritime law. By contrast, *Haslip* was a constitutional decision, holding that state law could, consistent with due process, impose punitive damages based on vicarious liability. No one disputes that maritime law *could* constitutionally impose punitive damages under such circumstances. The question is whether it does. For two centuries, every court (except ours in *Protectus Alpha*) has held it doesn't, and nothing the Supreme Court said in *Haslip* could possibly have changed that.

on vicarious liability. *See id.* at 652. Finally, in *CEH, Inc.* v. *F/V Seafarer*, 70 F.3d 694, 705 (1st Cir. 1995), the First Circuit, while taking a somewhat broader view of what constitutes a ship owner's fault, endorsed the principle that "some level of culpability" on the part of the ship owner is required before punitive damages may be imposed under maritime law.

The panel's decision is also contrary to the modern drift of maritime law, which has reaffirmed its historical reluctance to impose hedonic and punitive damages at all. *See Guevara* v. *Maritime Overseas Corp.*, 59 F.3d 1496, 1508 n.11 (5th Cir. 1995) (en banc). In *Miles* v. *Apex Marine Corp.*, 498 U.S. 19, 31-33 (1990), a unanimous Supreme Court held that the family of a seaman couldn't recover nonpecuniary damages in a wrongful death action brought under general maritime law. Courts have read *Miles* as barring nonpecuniary damages, including punitive damages, for wrongful death, personal injury and other related actions brought on behalf of seamen, *see Glynn* v. *Roy Al Boat Mgmt. Corp.*, 57 F.3d 1495, 1502-05 & n.14 (9th Cir. 1995); *Guevara*, 59 F.3d at 1503, 1506-07, 1512, and some have interpreted *Miles* as applying to non-seamen, *see Wahlstrom* v. *Kawasaki Heavy Indus., Ltd.*, 4 F.3d 1084, 1092 (2d Cir. 1993). While these cases involve the intersection of federal statutes with maritime common law, they confirm the Supreme Court's observation in *Executive Jet Aviation, Inc.* v. *Cleveland*, 409 U.S. 249, 270 (1972), that the "long experience [of] the law of the sea . . . is concerned with . . . limitation of liability." It makes no sense to hold that families of those who are killed and maimed at sea can't get punitive awards, or even damages for pain and suffering or loss of consortium, and yet *reverse* centuries of maritime law to make it easier for businessmen to recover billions in punitive damages for harm to their commercial interests.

The panel's decision exposes owners of every vessel and port facility within our maritime jurisdiction—a staggeringly huge area—to punitive damages solely for the actions of managerial employees. Because of the harsh nature of vicarious

liability, ship owners won't be able to protect themselves against our newfangled interpretation of maritime law through careful hiring practices. Accidents at sea happen—ships sink, collide and run aground—often because of serious mistakes by captain and crew, many of which could, with the benefit of hindsight, be found to have been reckless. For centuries, companies have built their seaborne businesses on the understanding that they won't be subject to punitive damages if they "[n]either directed it, nor countenanced it, nor participated in" the wrong, *The Amiable Nancy*, 16 U.S. at 559; the panel opinion has thrown this protection overboard.

This case demonstrates the pernicious impact of departing from the traditional protections of maritime law. The plaintiffs here suffered no physical injuries—their only claim was that the oil spill harmed their commercial fishing interests. *See Valdez I*, 270 F.3d at 1221. After the accident, Exxon acted as a model corporation—it spent over $2 billion to remove oil from the water and adjacent shore and $900 million to restore damaged natural resources. *Id.* at 1223. Furthermore, before the jury ever entered a verdict, Exxon compensated the plaintiffs for most of their damages. *See Valdez II*, 472 F.3d at 611-12. Yet the jury, perhaps subscribing to the maxim that a rising tide lifts all boats, took advantage of the vicarious liability instruction to award billions in punitive damages as a windfall to their fellow Alaskans.

As Exxon learned, a company can voluntarily compensate harmed parties, take every step imaginable to undo the tragic mess its agents created, and still be subject to the largest punitive award ever upheld by a federal court—all because it had the misfortune of hiring a captain who committed a reckless act. Moreover, the effects of this opinion are not limited to shippers and docks based in the Ninth Circuit: The shipping business knows no circuit, or even national, boundaries. Shippers everywhere will be put on notice: If your vessels sail into the vast waters of the Ninth Circuit, a jury can shipwreck your operations through punitive damages and the fact that you did

nothing wrong won't save you. Such major turbulence in the seascape of the law ought to come, if at all, from the Supreme Court.

Because my colleagues don't seem to share my concern that we have undermined the uniformity of maritime law and contravened long-settled Supreme Court precedent, as well as the unanimous view of our sister circuits, I dissent.

---

BEA, Circuit Judge, dissenting from the order denying the petition for rehearing en banc:

I agree with Judge Kozinski that punitive damages should not have been awarded in this case. However, even if punitive damages were appropriate, I note that the ratio of punitive damages to compensatory damages is excessive. The Supreme Court has instructed that "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of North America v. Gore*, 517 U.S. 559, 575 (1996). As the panel itself noted, the reprehensibility of Exxon's conduct here is "at most, a mid range." *In re the Exxon Valdez* (*Valdez II*), 472 F.3d 600, 618 (9th Cir. 2006) (per curiam). Importantly, the panel correctly concluded that "Exxon's conduct caused no actual physical harm to people," although it did cause "more than mere economic harm to them, because the economic effects of its misconduct produced severe emotional harm as well." *Id*. at 614.

Of course, the plaintiffs in *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408 (2003), had economic and emotional harm also. In that case, the Campbells brought a claim against State Farm for bad faith failure to settle within policy limits, fraud, and intentional infliction of emotional distress. The emotional distress the Campbells suffered was not limited to that caused by their business losses, as the

Exxon Valdez plaintiffs suffered. The Campbells were faced with a large potential judgment beyond insurance limits coverage—which the insurance company gaily told them would probably cost them their house. As in *Valdez II*, State Farm liquidated all economic damage by paying the third-party judgment *before* the Campbells filed their complaint. Nonetheless, the court awarded $1 million in compensatory damages and $25 million in punitive damages. The Supreme Court reversed the judgment and held that a 25 to 1 ratio of punitive to compensatory damages was constitutionally invalid as excessive. Instead, even considering the economic and emotional harm, in remanding, the Supreme Court stated "a punitive damages award at or near the amount of compensatory damages" would be appropriate. *Id*. at 425.

Although the Supreme Court has declined to set a bright-line ratio for punitive damages awards, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id*. Moreover, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps *only equal to compensatory damages*, can reach the outermost limit of the due process guarantee." *Id*. (emphasis added). The Supreme Court characterized the Campbells's $1 million compensatory damages award as "substantial." *Id*. at 426. Surely, then, the $513 million in compensatory damages here is also "substantial" damages. Hence, the 5:1 ratio adopted by the majority seems to violate the limits implied by the Court for a case where the reprehensibility of the conduct of the defendant does not include infliction of physical injury, nor an assessment for environmental damage. Accordingly, I respectfully dissent from denial of rehearing en banc.

## OPINION

PER CURIAM:

### I.  INTRODUCTION

We look for the third time at the punitive damages imposed in this litigation as a result of the 1989 grounding of the oil tanker *Exxon Valdez*, and the resulting economic harm to many who earned their livelihood from the resources of that area. *See Baker v. Hazelwood (In re the Exxon Valdez)*, 270 F.3d 1215 (9th Cir. 2001) [hereinafter *Punitive Damages Opinion I*]; *Sea Hawk Seafoods, Inc. v. Exxon Corp.*, No. 03-35166 (9th Cir., Aug. 18, 2003). We are precluded, as the jury was, from punishing Exxon for befouling the beautiful region where the oil was spilled, because that punishment has already been imposed in separate litigation that has been settled. *See Punitive Damages Opinion I*, 270 F.3d at 1242. As we explained in *Punitive Damages Opinion I*, the plaintiffs' punitive damages case was saved from preemption and res judicata because the award "vindicates only private economic and quasi-economic interests, not the public interest in punishing harm to the environment. *Id*. "The plaintiffs' claims for punitive damages expressly excluded consideration of harm to the environment." *In re the Exxon Valdez*, 296 F.Supp.2d 1071, 1090 (D. Alaska 2004).

The resolution of punitive damages has been delayed because the course of this litigation has paralleled the course followed by the Supreme Court when, in 1991, it embarked on a series of decisions outlining the relationship of punitive damages to the principles of due process embodied in our Constitution. *See, e.g.*, *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1 (1991); *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443 (1993) (plurality); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996); *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003). Intervening Supreme Court decisions have caused us to remand the matter twice to the district court

for reconsideration of punitives in light of evolving Supreme Court law. The district court's opinion, after our last remand for it to consider the impact of the Supreme Court's decision in *State Farm*, is published at *In re the Exxon Valdez*, 296 F. Supp.2d 1071 (D. Alaska 2004) [hereinafter *District Court Opinion*]. It is the subject of this appeal.

Now, with the guidance of the Supreme Court's decisions, the district judge's thoughtful consideration of the issues, and our own prior decisions in the litigation, we trust we are able to bring this phase of the litigation to an end. While we agree with much of the analysis of the district court, we are required to review de novo the district court's legal analysis in applying the Supreme Court's guideposts. *See Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436 (2001).

While the original punitive damages award was $5 billion and in accord with the jury's verdict, the district court reduced it to $4 billion after our first remand. *In re the Exxon Valdez*, 236 F. Supp. 2d 1043, 1068 (D. Alaska 2002), *vacated by Sea Hawk*, No. 03-35166. Then, after our second remand, it entered an award of $4.5 billion. *District Court Opinion*, 296 F. Supp. 2d at 1110. For the reasons outlined further in the factual development and the analysis of this opinion, we conclude that the ratio of punitive damages to actual economic harm resulting from the spill, reflected in the district court's award of $4.5 billion, exceeds by a material factor a ratio that would be appropriate under *Punitive Damages Opinion I* and the current controlling Supreme Court analysis. *See State Farm*, 538 U.S. at 425. We order a remittitur of $2 billion, resulting in punitive damages of $2.5 billion. We do so because, in assessing the reprehensibility of Exxon's misconduct, the most important guidepost according to the Supreme Court's opinion in *State Farm*, there are several mitigating facts. *See id.* at 419. These include prompt action taken by Exxon both to clean up the oil and to compensate the plaintiffs for economic losses. These mollify, at least to some material degree, the reprehensibility in economic terms of

Exxon's original misconduct. *Punitive Damages Opinion I*, 270 F.3d at 1242. In addition, in considering the relationship between the size of the award and the amount of harm, we concluded in our earlier punitive damages opinion that the substantial costs that Exxon had already borne in clean up and loss of cargo lessen the need for deterrence in the future. *Id.* at 1244. We disagree, however, with Exxon's ultimate contention that, as a result of two sentences in *Punitive Damages Opinion I*, written five years ago and before the Supreme Court's opinion in *State Farm*, Exxon is entitled to have punitive damages assessed at no higher than $25 million. *See id.*

Our dissenting colleague goes to the other extreme. Exxon's misconduct was placing a relapsed alcoholic in charge of a supertanker. *Punitive Damages Opinion I*, 270 F.3d at 1234. Yet, the dissent claims that we should ignore our unanimous conclusion in *Punitive Damages Opinion I*, 270 F.3d at 1242, that Exxon's conduct with respect to the spill was not intentional. The dissent effectively treats Exxon as though it calculatingly and maliciously steered the ship into disaster. Purporting to rely on the intervening Supreme Court decision in *State Farm*, the dissent also refuses to apply our earlier holding that Exxon's mitigation efforts reduce the reprehensibility of its conduct. This amounts to a rejection of the bedrock principle of stare decisis.

*State Farm* was an insurance contract case. Nothing in it suggests that this court's decision in *Punitive Damages Opinion I* was improper. The Supreme Court did not explicitly or implicitly hold that mitigation plays no role in determining the constitutionality of a punitive damages award. Such a lack of discussion in an insurance contract case cannot supplant our express holding in the toxic-tort arena that mitigation efforts are a factor in assessing the punitive damages award in this case. Controlling authority should not be ignored or distorted. As Learned Hand famously once said, "a victory gained by sweeping the chess pieces off the table is not endur-

ing." Learned Hand, Mr. Justice Cardozo, 52 HARV. L. REV. 361, 362 (1939).

We reiterate our previous holding that Exxon's conduct was not willful. Accordingly, a punitive damages award that corresponds with the highest degree of reprehensibility does not comport with due process when Exxon's conduct falls squarely in the middle of a fault continuum.

Because the history of this litigation tracks the recent juris-prudential history of punitive damages, our analysis is best made in light of a thorough understanding of that history. We therefore outline that history with what we hope is sufficient clarity and thoroughness.

## II.   LEGAL AND FACTUAL BACKGROUND

A.   *From the Time of the Accident through the First Punitive Damages Award and Denial of Motion for New Trial: The Common Law through the Supreme Court Decision in* TXO.

The *Exxon Valdez* ran aground on Bligh Reef in Alaska's Prince William Sound on March 24, 1989. Punitive damages at that time were governed by general common law principles. At common law, the jury determined the punitives, and the trial judge conducted a limited review to determine whether the jury's verdict was the product of passion and prejudice, or whether the award was one that shocked the conscience. *See* Renee B. Lettow, *New Trial for Verdict Against Law: Judge-Jury Relations in Early Nineteenth Century America*, 71 Notre Dame L. Rev. 505, 542-51 (1996); Paul DeCamp, *Beyond State Farm: Due Process Constraints on Noneconomic Compensatory Damages*, 27 Harv. J.L. & Pub. Pol'y 231, 246-48 (2003); *see also Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278 n.24 (1989) (affirming district court's application of Vermont's "grossly and manifestly excessive" standard for judicial review);

*Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 n.10 (1994). Although there were cases dating from the *Lochner* era that had suggested that there may be a due process ceiling on punitive damages, at the time of this accident in 1989, the Supreme Court had never invalidated an award on grounds that the size of the award violated due process. *See BMW v. Gore*, 517 U.S. at 600-01 (Scalia, J., dissenting) (discussing the history of due process review of punitive damages awards) (citing *Seabord Air Line R. Co. v. Seegers*, 207 U.S. 73, 78 (1907); *Southwestern Tel. & Tel. Co. v. Danaher*, 238 U.S. 482, 489-91 (1915); *Waters-Pierce Oil Co. v. Texas*, 212 U.S. 86, 111-12 (1909); *Standard Oil Co. of Ind. v. Missouri*, 224 U.S. 270, 286, 290 (1912); *St. Louis, I.M. & S.R. Co. v. Williams*, 251 U.S. 63, 66-67 (1919)).

In 1991, however, the Supreme Court decided *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1 (1993). There, for the first time in the modern era, the Court conducted a substantive review of an award of punitive damages. *Haslip* was an insurance fraud case, in which the agent pocketed the premiums and caused the plaintiff's insurance to lapse. *Id.* at 4-5. The Court upheld a punitive damages award that amounted to four times the award of compensatory damages and 200 times the out-of-pocket costs of the defrauded insured. *Id.* at 23-24. The Court noted that the ratios might be "close to the line," but said the award had to be upheld because it "did not lack objective criteria." *Id.* The Court therefore concluded that the punitive damages did not "cross the line into the area of constitutional impropriety." *Id.* The Supreme Court did not, at that time, and has not since, defined any bright line of constitutional impropriety. It has, repeatedly, indicated that there is none. *See, e.g.*, *State Farm*, 538 U.S. at 424-25.

In 1993, two years after *Haslip*, the Court took on another major punitive damages case. In *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993), the Court reviewed a jury award of $19,000 in compensatory damages

and $10 million in punitive damages. *Id.* at 451. That case arose out of an oil and gas development fraud scheme. *Id.* at 447-51. The case produced no majority opinion. The plurality, reiterating that due process places some limit on punitive damages, said that the award was not so "grossly excessive" that it should be overturned, thus invoking the standard used in *Haslip*. *Id.* at 462. The Court declined to provide any particular guidance in determining when an award would be "grossly excessive." *Id.* The plurality chose instead to say that the dramatic disparity between the actual financial loss and the punitive award was not controlling. *Id.* The award was upheld. *Id.*

It was against this background that the jury in this case was instructed in 1994. The jury was told to take into account the reprehensibility of the misconduct, the amount of actual or potential harm arising from the misconduct, and, additionally, to take into account mitigating factors such as the clean up costs and fines already imposed as deterrents. *District Court Opinion*, 296 F. Supp. 2d at 1081-82. The instructions were the product of mutual effort of the parties and the district court, and have not been seriously challenged. *Id.* They are not questioned here and were, in retrospect, quite forward looking.

On September 16, 1994, the jury returned a $5 billion punitive damages verdict, having some time earlier imposed a compensatory award of $287 million. The district court accepted the punitive award and entered judgment. Citing *Haslip* and *TXO*, the district court denied Exxon's motion for a new trial in January of 1995.

B.   *The Appeal of the Damage Allocation Plan and Our Decisions in* Baker *and* Icicle.

Prior to trial, several plaintiffs, many of the sea food processors, had entered into settlement agreements with Exxon. *Icicle Seafoods, Inc. v. Baker (In re the Exxon Valdez)*, 229

F.3d 790, 792 (9th Cir. 2000) [hereinafter *Icicle*]; *Baker v. Exxon Corp. (In re the Exxon Valdez)*, 239 F.3d 985, 986 (9th Cir. 2001) [hereinafter *Baker*]. The agreements anticipated a sizable punitive damages award. *See Icicle*, 229 F.3d at 793; *Baker*, 239 F.3d at 986-87. In return for receiving substantial millions in payments from Exxon, the settling plaintiffs, in two separate agreements, agreed to allocate a portion of their punitive award to Exxon. One agreement was a so called "cede back agreement," *Icicle*, 229 F.3d at 793, and the other was an assignment of the future award, *Baker*, 239 F.3d at 986-87.

The district court, however, did not know of the agreements during trial. *Icicle*, 229 F.3d at 793. When the court did learn of them, during consideration of the parties' proposed damage allocation plan, and after the punitives had been imposed in accordance with the jury's verdict, the district court frowned on the settlements. *Id.* at 794. In the district court's view, Exxon should have told the jury about the agreements so that the jury would have known how much Exxon was actually going to have to pay in punitive damages. *Id.* The district court, therefore, refused to permit the settling plaintiffs to receive any of the punitive damages award, on the theory that Exxon should not benefit from the settlements. *Id.*; *Baker*, 239 F.3d at 987. Exxon pursued two appeals from the district court's refusal to enforce the agreements: one involving the cede back agreement, *Icicle*, 229 F.3d at 793, and the other involving the assignment agreement, *Baker*, 239 F.3d at 987-88.

The two different forms of agreement were intended to have essentially the same effect: allowing Exxon to keep some portion of the eventual punitive award in exchange for settling compensatory damage claims. In *Icicle*, this panel considered the cede back agreement. In a thorough opinion, we held that the cede back agreement was valid and enforceable and that the jury quite properly was not told of its existence. *Icicle*, 229 F.3d at 800. We reasoned that had the jury

been told of the agreement, it might well have compensated for the settlement by imposing more damages. *Id.* at 798. This, in turn, would have frustrated the efforts of parties to reach settlements. We pointed out that settlements should be encouraged, particularly in large class actions like this one. *Id.* "Far from being unethical, cede back agreements make it easier to administer mandatory class actions for the assessment of punitive damages and encourage settlement in mass tort cases. As a result, such agreements should typically be enforced." *Id.*

The second appeal, *Baker*, considered an assignment agreement. *Baker*, 239 F.3d at 987-88. Following the *Icicle* reasoning, this panel reached the same conclusion. *Id.* at 988.

### C. *The Supreme Court's Decision in* BMW v. Gore.

As the parties were beginning their preparation for the first appeal of the $5 billion punitive damages award, the Supreme Court issued its first major due process/punitive damages decision after *TXO*. In 1996, it decided *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). This was the Supreme Court's first attempt to describe specific factors that a court should consider in reviewing a jury's award of punitive damages. *See id.* at 575. The Court invoked the traditional concepts of due process to describe the purpose of the review as an assurance of fair notice to the defendant of the consequences of its conduct. *Id.* at 574.

The Court described three factors to be considered. *Id.* at 575. The first was the reprehensibility of the conduct. *Id.* The Court explained that reprehensibility is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award," and said that an award should reflect "the enormity" of the offense. *Id.* (citations omitted).

The second factor was the disparity between the actual or potential harm to the plaintiffs flowing from that conduct, and

the punitive damages assessed by the jury. The Court said that the disparity factor was the most commonly cited. *Id.* at 580. The Court reasoned this factor is important because it "has a long pedigree" extending back to English statutes from 1275 to 1753 providing for double, treble or quadruple damages. *Id.* at 580-81. Thus the critical measure here is the ratio between the punitive award and the amount of harm inflicted on the plaintiff, or plaintiffs, before the court.

The third factor was the difference between the punitives and the civil and criminal penalties authorized by the state for that conduct. *Id.* at 583. The Court indicated that reviewing courts should use this factor to "accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.* at 583 (internal quotations omitted).

In *BMW v. Gore*, the defendant had engaged in a practice of repainting damaged cars and passing them off as never-damaged cars with their original paint. *Id.* at 563-64. The plaintiff who had purchased one of these cars was awarded $4,000 in compensatory damages and $4 million in punitives. *Id.* at 565. The Alabama Supreme Court reduced the punitives to $2 million, and the defendant petitioned for certiorari review. *Id.* at 567. The Supreme Court held the punitives were excessive. *Id.* at 585.

In examining the reprehensibility of the conduct, the Supreme Court in *BMW v. Gore* stressed that the only harm inflicted by the defendant was economic and not physical. *Id.* at 576. The Court also emphasized that the conduct to be considered was only the conduct of the defendant towards the plaintiff in the Alabama case and not other conduct that might be a part of a nationwide practice. *Id.* at 572. Justice Breyer's concurring opinion noted the danger in subjecting a defendant to punishment multiple times for the same conduct. *Id.* at 593 (Breyer, J., concurring).

Thus, in looking at the ratio between the punitives and the harm, and in stressing that the ratio must be a reasonable one,

the Court was holding that the ratio must be measured by the ratio of punitive damages to the harm suffered by the plaintiff in that case, without regard to harm that might have been experienced by others and for which the defendant might also be responsible. *Id.* at 580. It concluded that a ratio of 500 to 1 was grossly excessive. *Id.* at 583. Such an excessive ratio resulted from the jury's improperly measuring the punitives in relation to the damage inflicted on a nation of potential plaintiffs rather than the damage to the plaintiff before that jury. *Id.* at 573.

With respect to the third factor, the relationship between the punitive damages and the comparable penalties under state law, *BMW v. Gore* looked to the Court's federalism jurisprudence. The Court's opinion stressed that reviewing courts should be mindful of the need to pay due deference to the legislative judgments of states in assessing the reprehensibility of conduct. *Id.* at 583 ("[A] reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue.' ") (quoting *Browning-Ferris*, 492 U.S. at 301 (O'Connor, J., concurring in part, dissenting in part)).

Again refusing to draw any kind of mathematical bright line between acceptable and unacceptable ratios, the Court described the 500 to 1 ratio in *BMW v. Gore* as "breathtaking." *Id.* It remanded for further, not inconsistent, proceedings, because, unlike *Haslip*, where the Court affirmed a questionable award, the Court in *BMW* was "fully convinced" that this award was "grossly excessive." *Id.* at 585-86.

D. *The First Punitive Damages Appeal.*

It was against this background that briefing in the first appeal of the original $5 billion punitive damages award in this case went forward. Exxon contended the amount of the award violated due process principles, as described in *BMW*

*v. Gore*. *Punitive Damages Opinion I*, 270 F.3d at 1241. The district court had not had an opportunity to review *BMW v. Gore* before its original judgment became final and appealable upon denial of Exxon's motion for a new trial. *Id.*

In its appeal from the $5 billion award, Exxon, in addition to challenging the amount of the punitive damages, challenged the sufficiency of the evidence supporting punitive damages; the jury instructions; the allowability of any punitive damages as a matter of public policy, maritime law and res judicata; and the preemption of punitive damages by other federal law. Needless to say, briefing was extensive. After appellate proceedings were stayed from January 1998 to September 1998 for the parties to pursue a limited remand, this panel heard argument in May of 1999.

While the case was under submission, the Supreme Court granted certiorari in another Ninth Circuit case, and in May 2001, decided *Cooper v. Leatherman Tool Group*. The Court there held our review of punitive damages was to be de novo. *Cooper*, 532 U.S. at 436. This did not ease our task.

### E. *Punitive Damages Opinion I.*

We issued our first opinion on punitives damages in November, 2001. Our opinion went in detail through the facts of the disaster and the conduct of Exxon, and of Captain Hazelwood, because they bore so heavily on the consideration of the issues on appeal. *Punitive Damages Opinion I*, 270 F.3d at 1221-24. In an opinion of more than 40 pages, we rejected Captain Hazelwood's separate appeal, and dealt at some length with all of the issues raised by Exxon. We ultimately rejected all of them except the challenge to the amount of punitive damages. *Id.* at 1254.

Referring to the "unique body of law" that governs punitive damages, we focused on the two Supreme Court opinions that had been decided after the district court's decision in the case,

and we termed them "critical." *Id.* at 1239. These were *BMW v. Gore* and *Cooper v. Leatherman Tool Group*. We said:

> In *BMW*, the Supreme Court held that a punitive damage award violated the Due Process Clause of the Fourteenth Amendment because it was so grossly excessive that the defendant lacked fair notice that it would be imposed. Dr. Gore's car was damaged in transit, and BMW repainted it but did not tell Dr. Gore about the repainting when it sold him the car. The jury found that to be fraudulent, and awarded $4,000 in compensatory damages for reduced value of the car and $4 million in punitive damages. The Alabama Supreme Court cut the award to $2 million, but the Court held that it was still so high as to deny BMW due process of law for lack of notice, because the award exceeded the amounts justified under the three "guideposts." The *BMW* guideposts are: (1) the degree of reprehensibility of the person's conduct; (2) the disparity between the harm or potential harm suffered by the victim and his punitive damage award; and (3) the difference between the punitive damage award and the civil penalties authorized or imposed in comparable cases. We apply these three guideposts to evaluate whether a defendant lacked fair notice of the *severity* of a punitive damages award, and to stabilize the law by assuring the uniform treatment of similarly situated persons.

*Id.* at 1240-41 (internal quotations omitted). We noted that in *Cooper v. Leatherman Tool Group* the Supreme Court decided that "considerations of institutional competence" require de novo review of punitive damages awards. *Id.* at 1240 (quoting *Cooper*, 532 U.S. at 440).

We went on to observe that the district court had not reviewed the award under the standards announced in those cases because neither case had been decided by the time the

jury returned its verdict, and Exxon had never challenged the amount of the award on constitutional grounds until after the jury's verdict. *Id.* at 1241. In view of the need for de novo review and the intervening decisions of *BMW v. Gore* and *Cooper v. Leatherman Tool Group*, we remanded for reconsideration of punitive damages. *Id.* We also provided some observations on possible alternative analyses of punitive damages under the *BMW v. Gore* factors. *Id.* at 1241-46.

These observations began with the factor of reprehensibility, quoting the Supreme Court's admonition in *BMW v. Gore* that it is "[p]erhaps the most important indicum of the reasonableness of a punitive damage award." *Id.* at 1241. We pointed to the Court's analogy to criminal cases, and its statement that nonviolent crimes are less reprehensible than violent ones. *Id.* We drew an analogy to the facts of this case, where Exxon's conduct was reckless, but there was no intentional spilling of oil "as in a midnight dumping case." *Id.* at 1242. We agreed with the plaintiffs that Exxon's conduct was reprehensible in that it knew of the risk of an oil spill in transporting huge quantities of oil through the Sound, and it knew Hazelwood was a relapsed alcoholic. *Id.* at 1242. We observed, however, that such reprehensibility went more to justify punitive damages than to justify such a high amount. *Id.* We noted some mitigating factors, including prompt ameliorative action and the millions spent in clean up. *Id.*

We then turned to the ratio of actual harm caused by the misconduct to punitive damages awarded. *Id.* at 1243. Again analyzing *BMW v. Gore*, we said that it was difficult to determine what we called the "numerator," that is, the value of the harm caused by the spill. *Id.* We used the jury award of $287 million in compensatory damages as one possible numerator and also, as alternative numerators, the district court's estimates of harm, which at that time ranged from $290 million to $418 million. *Id.* We noted that if compensatory liability were used, any amounts Exxon had voluntarily paid in settlements should not be taken into account. We said that

[t]he amount that a defendant voluntarily pays before judgment should generally not be used as part of the numerator, because that would deter settlements prior to judgment. "[T]he general policy of federal courts to promote settlement before trial is even stronger in the context of large scale class actions."

*Id.* at 1244 (citing *Icicle*, 229 F.3d at 795; *Baker*, 239 F.3d at 988).

As a final observation on the relationship between the punitive damages award and the harm, we pointed out that the substantial clean up costs and other losses to Exxon from the oil spill had already had considerable deterrent effect. We indicated such deterrence should, depending on the circumstances, call for a lower, rather than a higher ratio. *Id.*

Turning to the third *BMW v. Gore* factor, we observed that the nature of criminal fines, which are potential state and federal penalties, might be useful in reviewing punitives. *Id.* at 1245. We observed that "[c]riminal fines are particularly informative because punitive damages are quasi-criminal." *Id.* We then looked to the general federal statutory measure for fines and discussed a number of alternative guideposts. *Id.* We noted the federal fines could range from $200,000 to $1.03 billion. *Id.* We looked as well at the ceiling of civil liability under the Trans-Alaska Pipeline Act and noted it was $100 million in strict liability for anyone who spills oil from the pipeline. *Id.*

In addition to those possible penalties, we looked at the actual penal evaluation made in the case by the Attorneys General of the United States and of the state of Alaska. *Id.* at 1245-46. Agreeing with the district court that they did not establish a limit, we noted that they did represent an adversarial judgment, by executive officers, of an appropriate level of punishment. *Id.* at 1246. Finally, without necessarily exhausting available analogies in the penalty field, we noted

that Congress had subsequently amended the statute to increase the amount of civil penalties for grossly negligent conduct, and that the maximum penalty here under the new federal statue would be a maximum of $786 million. *Id.* The federal penalties are based upon the number of barrels of oil spilled. 33 U.S.C. § 1321(b)(7).

In suggesting various possible guidelines to assess whether the $5 billion was "grossly excessive" we did not imply that any single guidepost would be controlling. Concluding that the $5 billion was too high to withstand the review we were required to give it under *BMW v. Gore* and *Cooper v. Leatherman Tool Group*, and noting that those cases came down after the district court had ruled, we remanded for it to apply the due process analysis required under those decisions, with what we hoped would be helpful guidance from our opinion. *Id.* at 1241. No district court analysis of *BMW v. Gore* was before us and we thus could not have decided any specific issue arising from any such analysis arising from its guideposts. *Id.* We offered only guidance culled from what was then controlling Supreme Court precedent and general principles applicable to the calculation of damage liability. *Id.*

### F. *The District Court Opinion on our First Remand.*

The district court again did an extensive analysis of the relative reprehensibility of Exxon's misconduct and of the harm it caused. *In re the Exxon Valdez*, 236 F. Supp. 2d at 1054-60. Though noting that an accurate assessment of the full extent of the plaintiffs' actual harm was impossible, the district court attempted to reconstruct that harm by adding together the jury's compensatory damages verdict of $287 million, judgments in related cases, as well as payments and settlements made to plaintiffs before and during the punitive damages litigation. *Id.* at 1058-60. The district court concluded that the actual harm was just over $500 million. *Id.* at 1060. The district court also concluded that the circumstances of this case justified a ratio of punitive damages to harm of 10 to 1. *Id.* at

1065. This calculation would have supported the original $5 billion award. *Id.* The district court nevertheless reduced the punitive damages to $4 billion, to conform to what it viewed as our mandate. *Id.* at 1068.

G. *The Second Appeal, the Supreme Court's Opinion in* State Farm*, and our Second Remand.*

Not surprisingly, Exxon appealed again. And, not surprisingly, the Supreme Court issued an opinion in still another punitive damages case while the appeal was pending. *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

The plaintiffs in *State Farm*, the Campbells, were involved in a head-on collision and sued their automobile insurer, State Farm, for bad faith. *Id.* at 413. The claim was based on State Farm's rejection of an offer to settle the Campbells' claims at the policy limit, State Farm's assurances to them that they had no liability for the accident, State Farm's resulting decision to take the case to court despite the substantial likelihood of an excess judgment, and its subsequent refusal to pay an adverse judgment over three times the policy limits. *Id.* at 413-14. The case was similar to *BMW v. Gore* in that there were only two plaintiffs before the jury. *Id.* Nevertheless, as in *BMW v. Gore*, the jury was allowed to consider the effects of similar but unrelated misconduct on many potential plaintiffs who were not before the court. *Id.* at 415. Final judgment after appeal to the Utah Supreme Court was for $1 million in compensatory and $145 million in punitive damages. *Id.* at 412. The United States Supreme Court remanded for the Utah courts to reduce the award. *Id.* at 429.

The Supreme Court in *State Farm* once again emphasized that the "most important indicium" of a punitive damages award's reasonableness is the relative reprehensibility of the defendant's conduct. *Id.* at 419; *see also BMW v. Gore*, 517 U.S. at 575. Yet *State Farm* significantly refined the reprehensibility analysis by instructing courts to weigh five spe-

cific considerations: (1) whether the harm caused was physical as opposed to economic; (2) whether the conduct causing the plaintiff's harm showed "indifference to or a reckless disregard of the health or safety of others;" (3) whether the "target of the conduct" was financially vulnerable; (4) whether the defendant's conduct involved repeated actions as opposed to an isolated incident; and (5) whether the harm caused was the result of "intentional malice, trickery, or deceit, or mere accident." 538 U.S. at 419. The Court did not rank these factors. It did explain, however, that only one factor weighing in a plaintiff's favor may not be sufficient to support a punitive damages award, and the absence of all factors makes any such award "suspect." *Id.*

As to *BMW v. Gore's* second guidepost, the ratio between harm or potential harm to the plaintiff and the punitive damages award, the Court "decline[d] again to impose a bright-line ratio which a punitive damages award cannot exceed." *Id.* at 425. But it provided some sharper guidance than it had in previous cases.

First, it indicated that ratios in excess of single-digits would raise serious constitutional questions, and that single-digit ratios were "more likely to comport with due process." *Id.* In fact, despite the Court's disclaimer that "there are no rigid benchmarks that a punitive damages award may not surpass," the Court strongly indicated the proportion of punitive damages to harm could generally not exceed a ratio of 9 to 1. *Id.* at 425 ("[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").

Second, the Court discussed particular combinations of factors that would justify relatively higher or lower ratios. For example, where a "particularly egregious act has resulted in only a small amount of economic damages" or where "the injury is hard to detect or the monetary value of the noneconomic harm might have been difficult to determine," ratios in

the high single-digits and perhaps even higher might be warranted. *Id.* (quoting *BMW v. Gore*, 517 U.S. at 582). Conversely, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.*

Finally, the Court minimized the relevance of criminal penalties as a guide, saying that they were not particularly helpful in determining fair notice. *Id.* at 428. Indeed, the Court did not analyze State Farm's potential criminal penalty at all, characterizing it as a "remote possibility." *Id.* As to civil penalties, the Court noted only that the $145 million punitive damages award "dwarfed" the $10,000 maximum applicable fine. *Id.*

The Supreme Court's opinion in *State Farm* was filed in 2003, after the district court, on our first remand, had already reviewed the punitive damages award. Because the district court performed its review without the benefit of the more focused guidance provided by the Court in *State Farm*, we remanded the second appeal summarily for the district court to reconsider the punitive damages award in light of *State Farm. Sea Hawk*, No. 03-39166.

H. *The District Court Opinion on our Third Remand and this Appeal.*

On remand for the third time, the district court, in an assessment similar to that in its opinion after our first remand, calculated plaintiffs' harm at $513.1 million. *District Court Opinion*, 296 F. Supp. 2d at 1103. Interpreting *State Farm* as holding that "single-digit multipliers pass constitutional muster for highly reprehensible conduct," and citing our decision in *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003), the district court decided to increase punitives from $4 billion to $4.5 billion. 296 F. Supp. 2d at 1110. The

final punitive damages award represented a ratio of just under 9 to 1. *Id.*

Once again, Exxon appealed. The plaintiffs also appealed, seeking to reinstate the jury's full $5 billion punitive damages verdict.

In this appeal, Exxon has focused intensively on the sentences in our earlier opinion where we noted that pre-judgment payments generally should not be part of the "numerator" to avoid deterring pre-judgment settlements. *Punitive Damages Opinion I*, 270 F.3d at 1242. Exxon has argued strenuously in the district court and to us that all of its settlement and other pre-judgment compensatory payments to plaintiffs must be subtracted from the over $500 million amount of actual harm in the ratio of punitive damages we use to review the award pursuant to the *BMW v. Gore/State Farm* factors. This would reduce the harm to the relatively paltry figure of $20.3 million.

We recognized in *Punitive Damages Opinion I* that Exxon, soon after the spill, instituted a claims payment system that almost fully compensated plaintiffs for their economic losses and did so promptly. *Id.* We also recognized that Exxon's prompt payment of compensatory damages should be a substantial mitigating factor in our review of punitives. *Id.*

In Exxon's appeal, major issues therefore relate to how, after *State Farm*, to assess the reprehensibility of Exxon's conduct and the effect of the mitigating factors. An important subsidiary issue is the extent to which we are bound to give literal effect to the sentences in our earlier opinion concerning subtracting the pre-judgment payments from actual harm, even though *State Farm* suggests the mitigating factors should be taken into account differently. For the reasons more fully explained in this opinion, we do not accept the minimal bottom line figure urged by Exxon and properly rejected by the

district court. We do, however, conclude there is merit to Exxon's contention that punitives should be reduced.

In their cross appeal, plaintiffs seek a reinstatement of the original $5 billion punitive award. We do not fully adopt their position either because doing so would peg the ratio of punitive damages to harm at a level *State Farm* reserves only for the most egregious misconduct. There was no intentional infliction of harm in this case. In addition, because Exxon's mitigating efforts after the accident diminish the relative reprehensibility of its original misconduct for purposes of reviewing punitive damages, such a high ratio is not warranted in this case.

## III.   ANALYSIS

A.   *Lessons From History.*

The history of the experience of the Supreme Court with punitive damages over the last decade-and-a-half reflects an evolutionary, not a revolutionary, course. In its first opinion in *Haslip*, the Court suggested that there might be a bright line of demarcation between punitive damages that comport with constitutional protections, and punitive damages that do not. *Haslip*, 499 U.S. at 23. Although it did not say what "the line" would be, it termed ratios of punitive damages to compensatory damages of 4 to 1, and to out-of-pocket costs of 200 to 1, to be close to it. *Id.*

In subsequent cases, however, the Court expressly avoided a rigid mathematical formula or limit, while refining its ratio analysis, concluding in *State Farm* that a ratio of punitive damages to actual harm of less than 10 to 1 was more likely to comport with due process than an award with a higher ratio. *State Farm*, 538 U.S. at 425. Along the way, the Court's experience reflects efforts to comport with the tried and true concepts inherent in due process, i.e., those of notice and fairness. *See, e.g.*, *Mullane v. Cent. Hanover Bank & Trust Co.*,

339 U.S. 306 (1950); *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).

In *State Farm*, the Court expressly noted its concern that the jury had been allowed to take into account the effect of conduct that may have taken place nationwide on thousands of potential plaintiffs. *State Farm*, 938 U.S. at 422. The unfairness of a defendant being hit with punitive damages many times for the same conduct was central to the Court's analysis in remanding. *Id.* The Court explained, "[p]unishment on these bases creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case non-parties are not bound by the judgment some other plaintiff obtains." *Id.* at 423.

Indeed, in *State Farm*, the Court stressed that the most important factor is the reprehensibility of the particular conduct in the case. *State Farm*, 538 U.S. at 419. This is because, in assessing the foreseeability of the possible effects of the defendant's conduct as it might bear on punitive damages, the reviewing court is in reality dealing with the traditional concept of the need for fair notice of the possible legal consequences of one's misconduct. *Id.* at 417.

Perhaps because such traditional elements of due process are flexible, the Supreme Court has not often taken on the task of reviewing the amount of punitive damages and has, in fact, overturned only two punitive awards because of their size. Each of them exceeded by a multiple of more than 100 the amount of compensatory payments necessary to compensate a plaintiff for the actual harm caused by the defendant's misconduct. *BMW v. Gore*, 517 U.S. at 582 (striking down a 500:1 ratio); *State Farm*, 538 U.S. at 429 (striking down a 145:1 ratio).

B.   BMW v. Gore/State Farm *Guideposts*.

[1] *BMW v. Gore* identified three guideposts for reviewing punitive damages, and *State Farm* added important refine-

ments. The guideposts are (1) the reprehensibility of the defendant's misconduct, (2) the ratio of punitives to harm, and (3) comparable statutory penalties. They need not be rigidly or exclusively applied, for we agree with our sister circuit that "[t]hese guideposts should not be taken as an analytical straight jacket." *Zimmerman v. Direct Federal Credit Union*, 262 F.3d 70, 81 (1st Cir. 2001). We must, nevertheless, examine them in the context of this case.

### 1. *Reprehensibility*.

The most important guidepost is the reprehensibility of Exxon's misconduct. *State Farm*, 538 U.S. 419 (quoting *BMW v. Gore*, 517 U.S. at 575). In our prior opinion, we defined the relevant misconduct supporting punitive damages as Exxon's keeping Hazelwood in command with knowledge of Hazelwood's relapse into alcoholism. We said that "Exxon knew Hazelwood was an alcoholic, knew that he had failed to maintain his treatment regimen and had resumed drinking, knew that he was going on board to command its supertankers after drinking, yet let him continue to command the *Exxon Valdez* through the icy and treacherous waters of Prince William Sound." *Punitive Damages Opinion I*, 270 F.3d at 1237-38. We see no need to reconsider this issue, despite Exxon's invitation to do so.

To evaluate the reprehensibility of the misconduct, *State Farm* refers to five sub-factors: (1) the type of harm, (2) whether there was reckless disregard for health and safety of others, (3) whether there were financially vulnerable targets, (4) whether there was repeated misconduct and (5) whether it involved intentional malice, trickery, or deceit, rather than mere accident. *State Farm*, 538 U.S. at 419.

**[2]** We must also consider mitigating factors. In *Punitive Damages Opinion I*, in the context of this particular case, we looked to Exxon's response to the catastrophe, including its prompt cleanup and compensatory payments. We held they

were factors mitigating the reprehensibility of the original misconduct. *Punitive Damages Opinion I*, 270 F.3d at 1242. "Reprehensibility should be discounted if defendants act promptly and comprehensively to ameliorate any harm they cause in order to encourage such socially beneficial behavior." *Id.*

The dissent takes issue with two components of our *BMW v. Gore* analysis. Its reasons, however, are surprising, because they contradict our unanimous holding in *Punitive Damages Opinion I*, 270 F.2d at 1242, that the spill was not intentional nor Exxon's conduct malicious. *See Dissent* at 6105 (characterizing Exxon's conduct as "malicious"). Then, the dissent misapplies the Supreme Court's mandate that we must perform an exacting appellate review to ensure that "an award of punitive damages is based upon an 'application of law, rather than a decisionmaker's caprice.' " *State Farm*, 538 U.S. at 418 (citing *BMW v. Gore*, 517 U.S. at 587).

First, the dissent maintains that the value of defendant's pre-litigation mitigation efforts should not affect punitive damages because the Supreme Court did not explicitly provide for such a calculus in *State Farm*. *Dissent* at 6096. Thus, the dissent would reject the principle of *stare decisis* and the law of the case and overturn our holding in *Punitive Damages Opinion I*, 270 F.3d at 1242, that Exxon's voluntary compensation to the plaintiffs effectuated good public policy in making an injured party whole as quickly as possible. We are not prepared to question the soundness of our unanimous conclusion in *Punitive Damages Opinion I* merely because intervening Supreme Court jurisprudence in the insurance context did not address the issue. *See State Farm*, 538 U.S. 408. By contrast here, we have already held that mitigation is both relevant and conscientious in the toxic-tort setting. It would be unwise in reviewing punitive damages to ignore the prompt steps of a defendant to take curative action in a mass tort case.

The dissent also claims that we improperly treat *BMW*'s fifth factor, the fault analysis, as a dichotomy with two mutu-

ally exclusive options: finding Exxon's conduct intentional and thus grossly reprehensible, or finding it accidental and thus to a large degree excusable. *Dissent* at 6099-6100. This is not our analysis. We acknowledge that Exxon's conduct was not intended to cause an oil spill, but neither was allowing a relapsed alcoholic to command a supertanker "mere accident." *Majority* at 6075. Exxon's reckless malfeasance falls in the middle of a continuum between accidental and intentional conduct. Accordingly, the fifth subfactor of the reprehensibility analysis supports neither high nor low reprehensibility on the part of Exxon.

The Supreme Court has reserved the upper echelons of constitutional punitive damages (a 9 to 1 ratio) for conduct done with the most vile of intentions. Thus, an affirmance of the district court's application of such a ratio in this case, where the defendant's conduct was reckless but not intentional, would transgress the requisite constitutional boundaries as the Supreme Court has explained them to date.

We turn now to the specific *State Farm* reprehensibility subfactors. These demonstrate that a 5 to 1 ratio more appropriately comports with due process.

a. *Type of Harm — Physical versus Economic.*

[3] To evaluate the type of harm, *State Farm* instructs us to consider whether "the harm was physical as opposed to economic," because conduct producing physical harm is more reprehensible. *State Farm*, 538 U.S. at 419. In this case the district court found that Exxon's conduct caused no actual physical harm to people, but caused more than mere economic harm to them, because the economic effects of its misconduct produced severe emotional harm as well. We agree with the district court's explanation that "the spilling of 11 million gallons of crude oil into Prince William Sound and Lower Cook Inlet disrupted the lives (and livelihood) of thousands of

claimants for years." *District Court Opinion*, 296 F. Supp. 2d at 1094.

**[4]** The Supreme Court has recognized conduct causing emotional as well as economic harm can be more reprehensible than conduct causing mere economic harm. *See BMW v. Gore*, 517 U.S. at 576 n.24. There it cited *Blanchard v. Morris*, 15 Ill. 35, 36 (1853), a case affirming a $700 punitive award against individuals who caused no physical harm and only $13 of economic harm, but used mental torture to extort it.

In *Bains LLC v. Arco Products Co.*, 405 F.3d 764, 775 (9th Cir. 2005), we held that "intentional, repeated ethnic harassment" increased the level of reprehensibility beyond the merely economic. *See also Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir. 2001). The gratuitous, intentional mental oppression of the victims made it "highly reprehensible conduct, though not threatening to life or limb." *Id.* At 777. In *Planned Parenthood v. American Coalition of Life Activists*, 422 F.3d 949, 958 (9th Cir. 2005), we held that a "true threat" increased reprehensibility even though it was not carried out, because the threat was intended to intimidate, and the economic component went beyond reducing the victim's wealth or income to trying to drive the victims away from their practices of medicine. Our *Planned Parenthood* decision was consistent with *BMW*'s citation with approval of older decisions upholding awards based on the "mental fear, torture, and agony of mind" caused by the threat of violence. *BMW* 517 U.S. at 575-76, n.24.

The district court concluded that the mental distress caused by the oil spill to the fishermen and property owners who were harmed economically justified a higher level of reprehensibility, and Exxon urges that emotional distress damages were not before the jury. Because our review must be *de novo* under *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436 (2001), we are not bound by the district

court's rationale. The cases discussed above show that punitive damages can — and traditionally do — consider the effects of the tortfeasor's conduct on the victim's mentality, not just his pocketbook. On the other hand, they may not go so far, and we need not, as to justify punitive damages for accidentally causing mental distress. *State Farm* states that compensatory damages for mental distress generally include a punitive element, so including mental distress in punitive damages may be duplicative. 538 U.S. at 426.

**[5]** What comes to something near the same result in this case, though it would not in most cases, is the entirely foreseeable disruption to the way tens of thousands people live their lives if a giant oil tanker were to run aground and spill its cargo. When tens of thousands of people have to change the way they make their living, their mental distress is not comparable to a BMW owner, or even a large number of BMW owners, being distressed because their cars were scratched or dented during shipment and repaired without their knowledge. Anyone setting an oil tanker loose on the seas under command of a relapsed alcoholic has to know that he is imposing this massive risk. Though spilling the oil is an accident, putting the relapsed alcoholic in charge of the tanker is a deliberate act. The massive disruption of lives is entirely predictable when a giant oil tanker goes astray. Thus, Exxon's reprehensibility goes considerably beyond the mere careless imposition of economic harm.

### b. *Reckless Disregard for Health and Safety of Others.*

**[6]** The second subfactor we consider in assessing reprehensibility is whether Exxon displayed a reckless disregard for the health and safety of others. *State Farm*, 538 U.S. at 418. We conclude this subfactor also militates toward greater reprehensibility. When Exxon trusted an officer it knew was incompetent to command the *Exxon Valdez* through the treacherous waters of Prince William Sound, Exxon acted

with reckless disregard for the health and safety of all those in the vicinity.

The *Exxon Valdez* grounding created a grave risk of physical harm for the crew and those who had to come to its rescue. The district court found that something as simple as an electro-static discharge could have ignited the crude oil and incinerated everyone in the vicinity. *District Court Opinion*, 296 F. Supp. 2d at 1095. We therefore agree with the district court that Exxon acted with reckless disregard of the health and safety of others when it put in command a person not competent to perform that role.

Exxon argues that *State Farm* requires us to ignore Exxon's disregard of the potential harm to the crew and rescuers because they are not plaintiffs to this litigation. Exxon misreads *State Farm*. *State Farm* disapproved punishing defendants for conduct in other states in which it might be lawful. 538 U.S. at 1522. Likewise, we had held in *White v. Ford Motor Company*, before *State Farm* came down, that a jury's punitive damages award based on extraterritorial conduct (plaintiff's lawyer had made a "send them a message" argument addressing nationwide conduct) violated principles of federalism established in *BMW v. Gore*. 312 F.3d 998, 1013-14 (9th Cir. 2002). These cases do not prohibit consideration of the potential harm to individuals merely because they are not plaintiffs. *See* 538 U.S. at 1522. The lesson is that the award in the other litigation "should have been analyzed in the context of the reprehensibility guidepost only." *Id.*; *BMW v. Gore*, 517 U.S. at 574 n.21. *State Farm* therefore holds it is appropriate to look at the risk to others in analyzing reprehensibility. *State Farm*, 538 U.S. at 427.

*State Farm* does warn against considering dissimilar acts of the defendant, or what is described as acts "independent from the acts upon which liability was premised." *Id.* at 422. The Court explained this is because "[a] defendant should be punished for the conduct that harmed the plaintiff, not for being

an unsavory individual or business." *Id.* at 423. Here, however, the conduct that threatened the safety of the crew and rescuers is the same conduct that harmed the plaintiffs, and is the conduct that underlies this punitive damages litigation: Exxon's knowingly placing a relapsed alcoholic in charge of the *Exxon Valdez*. The prohibition in *State Farm* against considering dissimilar acts does not apply here because taking into account the potential harm to the crew and rescuers punishes Exxon for the same conduct that harmed the plaintiffs. We have made this point before. See, for example, *Hangarter v. Provident Life and Accident Insurance Co.*, 373 F.3d 998, 1015 n.11 (9th Cir. 2004), where we analyzed company-wide policies in a single-plaintiff lawsuit and distinguished *State Farm's* warning against considering dissimilar acts. We said "unlike in *State Farm*, a legally sufficient nexus existed between Defendant's allegedly widespread corporate policies and the termination of [the plaintiff's] benefits." *Id.*

**[7]** Accordingly, where the same conduct risked harm to all, the risk to all can be considered as a factor in assessing reprehensibility. The district court did not err in recognizing that Exxon recklessly disregarded the physical safety of the crew and rescuers, and thereby increased the reprehensibility of its conduct in putting Hazelwood in command.

### c.   *Financially Vulnerable Targets.*

The district court found Exxon's conduct harmed financially vulnerable subsistence fishermen. *District Court Opinion*, 296 F. Supp. 2d at 1095. Exxon does not dispute that subsistence fishermen were financially vulnerable or that its reckless actions harmed them. It does contend that this factor applies only in fraud cases when a defendant intentionally defrauds financially vulnerable targets, such as the sick or elderly. While we do not believe the subfactor is so limited, we agree there must be some kind of intentional aiming or targeting of the vulnerable that did not occur here.

The purpose of reprehensibility analysis is to determine "the enormity" of the offense, which "reflects the accepted view that some wrongs are more blameworthy than others." *BMW v. Gore*, 517 U.S. at 575. The notion of "targeting" connotes some element of intent to harm particular individuals or categories of individuals. *See Planned Parenthood*, 422 F.3d at 958-59 (holding plaintiffs were financially vulnerable because the defendants' threats attempted to scare the plaintiffs into quitting the jobs on which the plaintiffs' livelihoods depended). Exxon did not intentionally target subsistence fishermen.

We conclude in this case that this consideration does not materially affect our assessment of the reprehensibility of Exxon's conduct.

### d. *Repeated Action.*

**[8]** The district court found that the conduct was repetitive because Exxon repeatedly allowed Hazelwood to command its supertankers for three years after it knew he had resumed drinking. *District Court Opinion*, 296 F. Supp. 2d at 1096. As the district court observed, Exxon did so, even though Exxon was fully aware of the tremendous risk of harm that it entailed. *Id.* "Over and over again, Exxon did nothing to prevent Captain Hazelwood [from sailing] into and out of Prince William Sound with a full load of crude oil." *Id.*

**[9]** Exxon argues that the relevant conduct is the grounding, not the knowledge of Hazelwood's incapacity to command. That is not consistent with our description of the relevant misconduct in *Punitive Damages Opinion I* as putting (and leaving) Captain Hazelwood in command. *Punitive Damages Opinion I*, 270 F.2d at 1237-38. The district court's finding of repetitive misconduct was not clearly erroneous. *Planned Parenthood*, 422 F.3d at 954. It militates in favor of increased reprehensibility.

e.  *Intentional Malice or Mere Accident.*

Putting Captain Hazelwood in command of the super-tanker was knowing and reckless misconduct. We agree with the district court that this misconduct was not "mere accident." *District Court Opinion*, 296 F. Supp. 2d at 1096.

Exxon points out that relieving Hazelwood of command would have denied Hazelwood an employment opportunity on the basis of alcoholism and theoretically subjected Exxon to a disability discrimination lawsuit. While Exxon's concerns may have been appropriate considerations in its evaluation of the risk, they do not justify the dangers its decision created to the livelihoods of tens of thousands of individuals. Spilling the oil was an accident, but putting a relapsed alcoholic in charge of a supertanker was not. And anyone doing so would know they were imposing a tremendous risk on a tremendous number of people who could not do anything about it. Exxon's knowing disregard of the interests of commercial fishermen, subsistence fishermen, fish processors, cannery workers, tenders, seafood brokers and others dependent on Prince William Sound for their livelihoods, cannot be regarded as merely accidental.

[10] At the same time, we must acknowledge that Exxon acted with no intentional malice towards the plaintiffs. We have consistently treated intentional conduct as more reprehensible than other forms of conduct subject to punitive damages. *See Zhang*, 339 F.3d at 1043; *Bains LLC v. Arco Products Co.*, 405 F.3d 764, 775 (9th Cir. 2005); *Southern Union Co. v. Southwest Gas Corp.*, 415 F.3d 1001, 1011 (9th Cir. 2005). In this case, however, as we have already recognized, "as bad as the oil spill was, Exxon did not spill the oil on purpose." *Punitive Damages Opinion I*, 270 F.3d at 1242-43. While the reprehensibility of Exxon's conduct that produced economic harm to thousands of individuals is high, the conduct did not result in intentional damage to anyone. This

subfactor thus militates against viewing Exxon's misconduct as highly reprehensible. *Id.*

    f.   *Mitigation of Reprehensibility*.

   **[11]** In assessing reprehensibility, we must not only take into account the reprehensibility of the original misconduct, but we have held that we must also take into account what has been done to mitigate the harm that the misconduct caused. *Punitive Damages Opinion I*, 270 F.3d at 1242; *see also Swinton*, 270 F.3d at 814-15 (discussing weight and relevance of post-tort mitigation evidence). As we said in *Punitive Damages Opinion I*, mitigation is to be considered "in order to encourage such socially beneficial behavior." *Punitive Damages Opinion I*, 270 F.3d at 1242. Here, Exxon instituted a system of voluntary payments to plaintiffs and it undertook prompt cleanup efforts. We agree with what we said before: "Exxon spent millions of dollars to compensate many people after the oil spill, thereby mitigating the harm to them and the reprehensibility of its conduct." *Id.*

**Volume 2 of 2**

g.  *Evaluation of Reprehensibility.*

Placing a relapsed alcoholic in control of a supertanker was highly reprehensible conduct. As a result, Exxon disrupted the lives of thousands of people who depend on Prince William Sound for their livelihoods, and endangered its own crew and their rescuers. Over the span of three years, Exxon could and should have relieved Captain Hazelwood of command of supertankers, but it did not do so. At the same time, however, Exxon did not act with malice toward plaintiffs or anyone else; Exxon did not intend to damage plaintiffs' livelihoods or cause them the emotional grief that went with the economic loss.

**[12]** Thus, Exxon's conduct is in the higher realm of reprehensibility, but not in the highest realm. In addition Exxon's post-grounding efforts to mitigate the harm serve materially to reduce the reprehensibility of the original misconduct. They reduce the reprehensibility for purposes of our review to, at most, a mid range.

2.  *Ratio of Harm to Punitives.*

The second *BMW* guidepost, as reiterated and refined by *State Farm*, is the "ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *State Farm*, 538 U.S. at 424. The goal of our review at this guidepost is to "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Id.* at 426.

a.  *Calculating The Harm.*

In this case, the figure the district court used to represent the harm to plaintiffs was $513.1 million. *District Court Opinion*, 296 F. Supp. 2d at 1103. Calculating the total harm to plaintiffs proved to be difficult because, in addition to considerable economic losses, the spill caused other undeniable, if not easily quantifiable, harms. *See id.* at 1094. The district court eventually calculated the harm figure by adding the compensatory damages verdict from the second phase of the trial to the actual judgments, settlements, and other recoveries various plaintiffs obtained as a result of the spill. *Id.* at 1099-1101.

Exxon does not dispute that the district court's finding of $513.1 million in harm is fundamentally a valid measure of the actual harm caused by the spill. However, it disagrees that it should be the figure we ultimately use as part of the ratio of punitive damages to harm that we review as the second guidepost.

Exxon's principal contention is that, before establishing the harm figure in the ratio, we must first deduct millions of dollars of payments and costs from the figure representing the total actual harm caused by the spill. Exxon would have us subtract a sum of about $493 million representing amounts paid to plaintiffs through Exxon's voluntary claims program and other settlements. Exxon would then have us use that reduced figure to represent the total harm in assessing the ratio of punitives to harm.

[13] This brings us to the central argument Exxon makes in this appeal. Exxon focuses on the language of our prior opinion in *Punitive Damages Opinion I* where we said, in a lengthy discussion of formulating possible ratios pursuant to *BMW v. Gore*, "[t]he amount that a defendant voluntarily pays before judgment should generally not be used as part of the numerator, because that would generally deter settlements

prior to judgment." 270 F.3d at 1244. Exxon contends this now means that in assessing the ratio of harm to punitives after *State Farm*, we should ignore the total harm in favor of a figure that in fact more closely approximates Exxon's remaining post-judgment liability for compensatory damages.

If we were to adopt Exxon's interpretation of that sentence as binding us now, the measure of harm would be a meager $20.3 million. Applying the ratio of close to 1 to 1 that Exxon asserts is appropriate, Exxon contends we should cap punitive damages at $25 million. Under Exxon's theory, even using a ratio of 9 to 1, which approaches the highest allowable under *State Farm*, punitive damages would be capped at $182.7 million. This would be the limit, even though Exxon's recklessness led to more than $500 million in harm. We said, in discussing the nature of the relationship between punitive damages and harm:

> The "reasonable relationship" is intrinsically somewhat indeterminate. The numerator is "the harm likely to result from the defendant's conduct." [*BMW v. Gore*, 571 U.S. at 581]. The denominator is the amount of punitive damages. Because the numerator is ordinarily arguable, applying a mathematical bright line as though that were an objective measure of how high the punitive damages can go would give a false suggestion of precision. That is one reason why the Supreme Court has emphasized that it is not possible to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." [*BMW v. Gore*, 517 U.S. at 576]. . . .

> Although it is difficult to determine the value of the harm from the oil spill in the case at bar, the jury awarded $287 million in compensatory damages, and the ratio of $5 billion punitive damages to $287 million in compensatory damages is 17.42 to 1. The

district court determined that "total harm could range from $287 million to $418.7 million," which produces a ratio between 12 to 1 and 17 to 1. This ratio greatly exceeds the 4 to 1 ratio that the Supreme Court called "close to the line" in *Pacific Mutual Life Ins. Co. v. Haslip*[, 499 U.S. at 23].

The amount that a defendant voluntarily pays before judgment should generally not be used as part of the numerator, because that would deter settlements prior to judgment. "[T]he general policy of federal courts to promote settlement before trial is even stronger in the context of large scale class actions," such as this one. [*Cf. Icicle*, 229 F.3d at 795; *Baker*, 239 F.3d at 988].

*Punitive Damages Opinion I*, 270 F.3d at 1243-44.

The district court rejected the proposition that voluntary payments before judgment should not generally be used as part of the calculation of harm. But our prior decision did not constrain the ratio analysis so firmly as Exxon contends. We did not say that voluntary payments before judgment could not be considered in calculating the numerator for purposes of comparing the numerator with the amount of the award; we said that they "generally" could not. Considerations of settlement, critical to our analysis in *Icicle*, 229 F.3d 790, bear on the due process concerns at the heart of *BMW*'s discussion. Whenever a defendant governed by a board is sued for conduct egregious enough to create a genuine risk of punitive damages, those making its litigation decisions have to try to predict what may happen in court. Some may recommend obdurate resistance, and some may recommend settlement, or prejudgment payments even without settlement, each making arguments based on predictions. Those recommending payment can reasonably predict that the entity will not be hammered as hard as if it obstinately resisted acceptance of any responsibility. And their prediction would be reasonable.

Criminal penalties have always been somewhat more lenient for those who accepted responsibility prior to judgment, *see United States v. Gonzalez*, 897 F.2d 1018, 1021 (9th Cir. 1990) (upholding the constitutionality of U.S.S.G. §3E1.1), and punitive damages are but a civil version of punishment for wrongdoing. It makes no practical sense to disarm all those in the future who want their boards to accept some responsibility by cutting out all the benefit their firms would get.

**[14]** There is a limit, however, to how far acceptance of responsibility goes in both contexts. No criminal defendant guilty of a serious wrong ordinarily resulting in lengthy imprisonment could reasonably assume that he would receive no imprisonment at all if he promptly pleaded guilty. And no defendant's board could reasonably predict that the defendant could escape all punishment by paying predicted compensatory damages before judgment. While "generally" prepayments should not be used as part of the calculation of harm, *Punitive Damages Opinion I*, 270 F.3d at 1244, that is not a mechanical arithmetic limit, just as the nine to one limit is not a mechanical arithmetic limit. *See State Farm*, 538 U.S. at 425; *Planned Parenthood*, 422 F.3d at 962; *Bains*, 405 F.3d at 776-77. Due process considerations limit punitive damages to what the wrongdoer could reasonably foresee, and that works both ways.

**[15]** Therefore, Exxon's argument goes too far. It would produce, in Exxon's analysis, a $25 million limit on punitive damages where the harm was $513 million but $493 million was paid before judgment. For purposes of notice to a tortfeasor of its liability risk, $25 million for causing a half billion loss would obviously be too good to be true. A defendant cannot buy full immunity from punitive damages by paying the likely amount of compensatory damages before judgment.

There are also some secondary issues relating to calculating harm. One concerns payments made by Aleyska Pipe Lines

Service Corporation. Exxon asks us to set off $98 million that its original co-defendant Alyeska Pipe Lines Service Corporation paid in settlement of plaintiffs' claims. A consortium of oil companies, including Exxon, had contracted with Alyeska to respond to any oil spill in the area. After the *Exxon Valdez* disaster, plaintiffs sued Alyeska for negligence in its response to the spill, and eventually settled all claims against Alyeska, including punitive damages, for $98 million. Exxon's argument here is that this $98 million payment represents harm attributable to Alyeska's negligence, not Exxon's recklessness, and therefore should not be used to calculate damages designed to punish and deter Exxon's own harmful conduct.

There are two major reasons why Exxon's position is not correct. First, the harm caused by the oil spill is attributable to Exxon under tort law principles. Exxon knowingly placed a relapsed alcoholic in control of a supertanker loaded with millions of gallons of oil. When it did so, Exxon accepted the foreseeable risk from its choice of captain that the tanker would have an accident causing an oil spill, and that Alyeska might further aggravate the harm. *See* Restatement (Second) of Torts §§ 433(a) cmt. c, 447(c),[1] cmt. e.[2] In fact, William Stevens, the President of Exxon, testified

---

[1]"The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if . . . (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent."

[2]"The words 'extraordinarily negligent' denote the fact that men of ordinary experience and reasonable judgment, looking at the matter after the event and taking into account the prevalence of that 'occasional negligence,' which is one of the incidents of human life,' would not regard it as extraordinary that the third person's intervening act should have been done in the negligent manner in which it was done. Since the third person's action is a product of the actor's negligent conduct, there is good reason for holding him responsible for its effects, even though it be done in a negligent manner, unless the nature of the negligence is altogether unusual."

before Congress that Exxon knew Alyeska was not prepared to contain a spill of the size caused by the *Exxon Valdez*. Because Exxon could be held liable for this foreseeable risk, the district court properly included the harm caused by Alyeska's response as the natural consequence of the harm caused by Exxon.

**[16]** Second, the situation Exxon now complains of is strictly of its own making. In 1994, the Supreme Court held that the proportional fault rule governs calculation of non-settling defendant's liability for compensatory damages in maritime torts. *See McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994). Instead of following *McDermott*, Exxon agreed with plaintiffs to proceed as if a pro tanto rule with respect to co-defendants' settlements still governed.[3] Exxon apparently thought it more advantageous at the time to have the $98 million deducted from the final compensatory damage award after the fact, rather than have the jury make a proportionate fault finding. Since Exxon has already agreed that the $98 million does not represent harm attributable to Alyeska, Exxon is not warranted in asserting that this is what it represents now.

---

[3]The stipulation between the parties reads in relevant part:

"[N]otwithstanding the rule of proportionate shares set out in *McDermott, Inc. v. AmClyde*, credit for the Aleyska settlement . . . shall be deducted from the sum that would, in the absence of this stipulation, be the aggregate amount of any judgment or judgment in favor of plaintiffs . . . and the liability of Exxon and Shipping for compensatory damages to any and all plaintiffs herein shall be reduced by the aggregate sum of $98 million. . . . The parties expressly recognize and agree that the sum of $98 million is not necessarily a fair measure of what would be Alyeska's proportionate share of liability to plaintiffs[,] but the parties are entering into this Stipulation in order to avoid the alteration of their trial preparation that would result from a last-minute overturning of the parties' assumption that [the pro tanto approach] would govern at trial and from requiring litigation of Alyeska's proportionate share."

Exxon also contends that some $34 million included in the district court's harm finding should not properly be considered harm at all. This figure represents an apparent $9 million overpayment by the Trans-Alaska Pipeline Liability Fund, $13.4 million from the Phase IV settlement Exxon claims is already accounted for elsewhere in the district court's calculations, and $11.5 million paid to Native corporations and municipalities for environmental clean up.

We conclude that the $9 million overpayment, inadvertently included in the district court's findings, should be subtracted from the total harm. Because Exxon does not specify where the $13.4 million in double-counting is reflected in other parts of the district court's calculation, however, we are unable to determine from our own review of the record where they might be included. Therefore, Exxon has failed to convince us that this figure should be reduced from the harm.

Finally, the $11.5 million Exxon paid to the plaintiffs for clean up, like its early settlement of plaintiffs' prospective commercial losses, is a mitigating factor relevant to our judgment about whether this punitive damages award is appropriate. Like the earlier settlements the proper place for its influence is as a mitigating circumstance to be considered in our overall determination of the ratio's reasonableness. It does, however, represent a part of the total harm for which Exxon is accountable.

**[17]** In sum, the district court's attempt to approximate the actual harm by adding together the various judgments, settlements, and liabilities that Exxon had already acknowledged was sound. Subtracting the $9 million Trans-Alaska Pipeline Liability Fund overpayment that the district court inadvertently overlooked, we conclude this record supports a total harm component of $504.1 million for purposes of analyzing the ratio of harm to punitives.

b.  *Evaluating the Reasonableness of the Ratio of Harm to Punitives.*

After our second remand, the district court reduced the original punitive damages award of $5 billion to $4.5 billion. This yielded a punitive damages to harm ratio of 8.77 to 1. After our $9 million adjustment to the harm figure, that ratio now stands at 8.93 to 1—a proportion bordering on the presumption of constitutional questionability. *See State Farm*, 538 U.S. at 425.

**[18]** In *State Farm*, the Supreme Court explained that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425. Relatively high single-digit ratios and perhaps even double-digit ratios may comply with due process where "a particularly egregious act has resulted in only a small amount of economic damages" or where "the injury is hard to detect or the monetary value of the noneconomic harm might have been difficult to determine." *Id.* (quoting *BMW v. Gore*, 517 U.S. at 582). Conversely, lower single-digit ratios, even as low as 1 to 1, might mark the outer limits of due process where compensatory damages are substantial. *Id.* This strongly suggests the ratio here is too high.

Our own decisions are also helpful. In *Planned Parenthood*, we used this guidance from *State Farm* to construct a "rough framework" for determining the appropriate ratio of punitive damages to harm. *See* 422 F.3d at 962. We held that in cases where there are "significant economic damages" but behavior is not "particularly egregious," a ratio of up to 4 to 1 "serves as a good proxy for the limits of constitutionality." *Id.* (citing *State Farm*, 538 U.S. at 425). In cases with significant economic damages and "more egregious behavior," however, a single-digit ratio higher than 4 to 1 "might be constitutional." *Id.* (citing *Zhang*, 339 F.3d at 1043-44; *Bains*, 405 F.3d at 776-77). Finally, in cases where there are "insignificant" economic damages and the behavior is "particularly

egregious," we said that "the single-digit ratio may not be a good proxy for constitutionality." *Id.*

The circumstances of this case fit into the second class of cases in the *Planned Parenthood* framework. Exxon's reckless decision to risk the livelihood of thousands by placing a relapsed alcoholic in command of a supertanker, while mollified by its prompt settlement and clean up policies, was "particularly egregious." Moreover, the $500 million of loss is well within the range of "significant" economic damages. Thus, under *Planned Parenthood*, an appropriate ratio would be above 4 to 1.

**[19]** Our review of the reprehensibility and mitigation under the first guidepost of reprehensibility, however, compels us to conclude the award should be toward the lower end of that range. Our cases have generally reserved high single-digit ratios for the most egregious forms of intentional misconduct, such as threats of violence and intentional racial discrimination. *See Zhang*, 339 F.3d at 1044 (upholding a ratio of 7:1 for intentional racism); *Bains*, 405 F.3d at 776-77 (remanding for district court to set a ratio between 6:1 and 9:1 for intentional racism); *Planned Parenthood* 422 F.3d at 952, 963 (remitting to a 9:1 ratio for threats of violence). Exxon's conduct in this case, while inexcusable, did not involve any intentional conduct that would normally be required to support a punitive damages award with a high single-digit ratio.

**[20]** Here mitigating factors also come into play. Exxon instituted prompt efforts to clean up the spill and to compensate the plaintiffs for their economic harm. As we earlier observed, if a defendant acts promptly to ameliorate harm for which it is responsible, the size of a punitive damages award should be reduced to encourage socially beneficial behavior. *Punitive Damages Opinion I*, 270 F.3d at 1242. Moreover, the costs that Exxon incurred in compensating the plaintiffs and cleaning up the oil spill have already substantially served the

purposes of deterrence, lessening the need for a high punitive damages award. *Id.* at 1244.

**[21]** Thus, Exxon's conduct was particularly egregious and involved significant economic damages. Nevertheless, its conduct was not intentional and it promptly took steps to ameliorate the harm it caused. With these considerations in mind, we conclude that a punitive damages to harm ratio of more than 5 to 1 would violate due process standards under current controlling Supreme Court and Ninth Circuit authority.

    3.   *Comparable Penalties*.

The third *BMW v. Gore/State Farm* guidepost is comparable legislative penalties. Given the emphasis on this factor in *BMW v. Gore*, we went to some lengths in *Punitive Damages Opinion I* to extrapolate the comparable penalties that would be imposed under state and federal law for the spill, the highest being approximately $1.03 billion dollars.

In *State Farm*, however, the Supreme Court stated that "need not dwell long on this guidepost." *State Farm*, 538 U.S. at 428. In that case, the comparable penalties were not particularly informative: the comparable civil penalty was easily "dwarfed" by the punitive award, and as to criminal penalties, the Court explained that although their existence "does have bearing on the seriousness with which a State views the wrongful action," they had "less utility" "[w]hen used to determine the dollar amount of the award." *Id*.

In our own circuit's more recent post-*BMW v. Gore* and *State Farm* cases, we have generally not attempted to quantify legislative penalties. We have looked only to whether or not the misconduct was dealt with seriously under state civil or criminal laws. *See, e.g.*, *Planned Parenthood*, 422 F.3d at 963. In several recent decisions we have not discussed the factor at all. *See Southern Union Co.*, 415 F.3d at 1009-11 (9th Cir. 2005); *Hangarter*, 373 F.3d at 1014-15. This may be

because legislative judgments, unlike jury verdicts, do not represent an individualized assessment of reprehensibility.

Here, the matter of spilling oil in navigable water has clearly been taken quite seriously by legislatures, with Congress enacting a specific statute after the spill, and state and federal law having already authorized substantial penalties. *See Punitive Damages Opinion I*, 270 F.3d at 1245-46. Thus, the third *BMW v. Gore/State Farm* factor, substantial legislative penalties, supports our conclusion that Exxon's reckless conduct merits substantial punitive damages.

## IV. CONCLUSION

For the foregoing reasons, Exxon's reckless misconduct in placing a known relapsed alcoholic in command of a supertanker, loaded with millions of barrels of oil, to navigate the pristine and resource abundant waters of Prince William Sound was reckless and warrants severe sanctions. The misconduct did not, however, warrant sanctions at the highest range allowable under the due process analysis, as explained in the Supreme Court's most recent opinion in *State Farm*.

[22] The district court's imposition of punitive damages of $4.5 billion, entered after our remand to reconsider due process in light of *State Farm*, represents damages at the very highest range, and is not warranted. It is not consistent with the Supreme Court's opinion in *State Farm* or with the most important tenets of our prior opinion in *Punitive Damages Opinion I* relating to Exxon's mitigation of reprehensibility. Although a one to one ratio marked the upper limit in *State Farm*, the conduct here was far more egregious and justifies a considerably higher ratio. An award of damages representing a ratio of punitives to harm of 5 to 1 is consistent with both.

[23] The judgment of the district court is VACATED, and the matter is remanded with instructions that the district court

further reduce the punitive damages award to the amount of $2.5 billion. We have decided pursuant to the *de novo* standard of review imposed by *Leatherman*, 532 U.S. at 436, that this is the appropriate limit on punitive damages in this case under the prevailing legal precedent. Thus, we do not remand for further consideration of what the limit may be. It is time for this protracted litigation to end.

VACATED AND REMANDED.

---

BROWNING, Circuit Judge, dissenting:

Because I believe the punitive damages award in this case is not "grossly excessive," I would affirm. In reviewing the size of a punitive damages award, our sole duty is to ensure its imposition does not violate due process. Where an award lies within the bounds of due process, as this one does, we may not substitute a figure we consider more reasonable for one fairly awarded by a jury and properly reviewed by a district court. Therefore, I respectfully dissent.

## 1. Due Process Review of Punitive Damages

To comport with the Constitution, a punitive damages award must strike the proper balance between the state goals of deterrence and retribution and a defendant's due process right to be free from arbitrary punishment. *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416-17 (2003). The Supreme Court has determined the balance is upset at the point an award becomes "grossly excessive," reasoning that, "[t]o the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.* at 417 (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 42 (1991)).

But as the majority notes, *ante* at 6065, the Court has shown little inclination to define "grossly excessive" more

concretely. *See State Farm*, 538 U.S. at 424; *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582 (1996). While it has several times hinted at the possibility of establishing a 4 to 1 benchmark ratio of punitive damages to compensatory damages, it has never explicitly done so. *See State Farm*, 538 U.S. at 425 (citing *BMW*, 517 U.S. at 581; *Haslip*, 499 U.S. at 23-24). Instead, the one constitutional limit the Court has identified is that generally found between single-digit and double-digit multipliers. *See id.* ("[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. . . . Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 [or] 145 to 1." (internal citations omitted)).

The Supreme Court's reluctance to establish a more concrete limit, or to adopt any other sort of categorical approach, counsels that in cases such as the one at bar, "[t]he judicial function is to police a range, not a point." *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003) (citing *BMW*, 517 U.S. at 582-83; *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 458 (1993)). We should let this punitive damages award stand unless the *BMW* factors indicate with some certainty that it was the product of caprice or bias such that its imposition violates Exxon's right to due process.[1] "Assuming that fair procedures were followed, a judgment that is a product of that process is entitled to a strong presumption

---

[1] The majority correctly recognizes, *ante* at 6047, that a determination that an award is "grossly excessive" is reviewed de novo. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436 (2001). De novo review, however, is only applied to determine the constitutional upper limit on a punitive damages award in a given case. If the award does not exceed this ceiling, we owe deference to the determination of the district court and jury. *See id.* at 433-34 (noting that within substantive limits on an award, the jury has discretion in establishing the precise number). *Cooper* does not give us free reign to pick the number we would have chosen had we sat as the jury or district court.

of validity. Indeed, there are persuasive reasons for suggesting that the presumption should be irrebuttable, or virtually so." *TXO*, 509 U.S. at 457 (plurality opinion) (internal citations omitted).

No procedural concerns are present here that, at the outset, might weaken the "strong presumption of validity" to which this award is entitled. *See BMW*, 517 U.S. at 586-87 (Breyer, J., concurring) (citing *TXO*, 509 U.S. at 457; *Haslip*, 499 U.S. at 40-42); *see also id.* at 583 ("In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis."). The jury received thorough, almost prescient, punitive damages instructions.[2] And although Exxon is a large corporation, there is no indication that the size of this punitive damages award resulted from an improper "emphasis on the wealth of the wrongdoer" at trial, *see TXO*, 509 U.S. at 464, or from an attempt by Plaintiffs or the jury to "make up for the failure of other factors, such as 'reprehensibility,' " *see BMW*, 517 U.S. at 591 (Breyer, J., concurring).[3]

---

[2]The district court explained the retributive and deterrent purposes of punitive damages and the "appropriate," i.e., non-environmental, countervailing "Alaska-oriented" interests of the plaintiffs; cautioned the jury that punitive damages must have a rational basis in the record and bear a reasonable relationship to the harm; admonished the jury not to be arbitrary; and, perhaps most importantly, alerted them that they could take Exxon's mitigation efforts into account when determining both whether punitive damages were warranted and, if so, the size of the award. *See In re Exxon Valdez*, 296 F. Supp. 2d 1071, 1091 (D. Alaska 2004). Considering that *BMW* and *State Farm* were decided after the jury trial, these instructions indeed were, as the majority notes, *ante* at 6051, "in retrospect, quite forward looking."

[3]Indeed to the contrary, there is evidence in the record comparing this award to Exxon's wealth in a manner that suggests the award was neither capricious nor an instance of over-deterrence. *See In re Exxon Valdez*, 296 F. Supp. 2d at 1105-06 ("[A]fter judgment was entered on the punitive damages award, Exxon's treasurer advised the court that 'the full payment of the Judgment would not have a material impact on the corporation or its credit quality.' ").

Furthermore, Exxon's conduct implicates a strong state interest in punishing reckless behavior and deterring its future repetition. Our constitutional review must consider punitive damages in the context of these state interests. *See id.* at 568 ("Only when an award can fairly be categorized as 'grossly excessive' *in relation to these interests* does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." (emphasis added)). In both *State Farm* and *BMW*, the Court's guidepost analysis was not an entirely separate endeavor, but instead gave structure to its constitutional concern that the defendants' due process rights were violated by judgments incorporating punishment for conduct not properly before the awarding court. *See State Farm*, 538 U.S. at 419-24 (discussing out-of-state conduct and conduct unrelated to plaintiffs' injuries); *BMW*, 517 U.S. at 568-73 (describing out-of-state conduct).

In stark contrast, there is no concern here that the scope of appropriate state interests has been exceeded. This punitive damages award was imposed pursuant to strong, but properly circumscribed, state interests. As the district court noted, Plaintiffs' collection of federal and state claims all arise out of harm to "Alaska fisheries, Alaska business, [and] Alaska property" caused by Exxon's conduct having "a direct nexus with the grounding of the Exxon Valdez on Bligh Reef in Prince William Sound." *See In re Exxon Valdez*, 296 F. Supp. 2d at 1090-91.

Thus, before engaging in the multi-factored analysis introduced in *BMW* and reiterated in *State Farm*, it is important to note that we are not faced here with any of the major constitutional concerns present in those cases.

## 2.   BMW *Guidepost Analysis*

Although I agree with much of the majority's analysis under *BMW* and *State Farm*, I cannot agree with it all. Despite clear guidance from the Court that reprehensibility is

the critical factor, the majority, *ante* at 6067, 6075-76, gives defining weight to a consideration entirely of its own creation. It then engages, *ante* at 6087-88, in what appears to be the very "categorical approach" the Supreme Court has consistently rejected. *See BMW*, 517 U.S. at 582. An appropriate evaluation of the award in question demonstrates it is constitutionally permissible.

### (a)  Reprehensibility

In its most recent punitive damages opinion, the Supreme Court gave direct instruction to courts evaluating reprehensibility. *State Farm*, 538 U.S. at 419. As the majority correctly notes, *ante* at 6061-62, we must weigh five factors: (1) whether the harm was solely economic, (2) whether the conduct showed indifference to or reckless disregard for others' health and safety, (3) whether the conduct's target was financially vulnerable, (4) whether the conduct involved repeated actions, and (5) whether the harm resulted from intentional malice or mere accident. *State Farm*, 538 U.S. at 419. Somewhat inexplicably, though, the majority adds to the *State Farm* factors one of its own creation—post-tort mitigation. *See ante* at 6067 ("We must also consider mitigating factors."); *id.* at 6076. I do not agree that mitigation should be considered in a reprehensibility analysis. Furthermore, unlike the majority, I believe that all five *State Farm* factors weigh in favor of finding that Exxon's reckless conduct was highly reprehensible.

### (i)  Mitigation

I cannot agree with the majority's assertion that we must consider Exxon's post-tort mitigation in evaluating the reprehensibility of its original misconduct. *See ante* at 6067-68. The majority is correct that when we previously considered Exxon's conduct, we suggested mitigation should be considered as part of the reprehensibility analysis. *See Baker v. Hazelwood* (*In re the Exxon Valdez*), 270 F.3d 1213, 1242

(9th Cir. 2001) [hereinafter *Punitive Damages Opinion I*]. However, subsequent to our decision in *Punitive Damages Opinion I*, the Supreme Court decided *State Farm*, which significantly refined the Court's punitive damages jurisprudence. The analysis of reprehensibility in *State Farm* differs from our analysis in *Punitive Damages Opinion I*, and, as intervening controlling authority, gives us reason to reconsider our prior approach. *See United States v. Bad Marriage*, 439 F.3d 534, 538 (9th Cir. 2006) (noting that a court may reexamine an issue it previously decided if "intervening controlling authority makes reconsideration appropriate").

When we considered mitigation in *Punitive Damages Opinion I*, Supreme Court precedent provided limited guidance for the reprehensibility analysis. In *State Farm*, however, the Supreme Court explained that courts should use five specific factors to evaluate reprehensibility. 538 U.S. at 419. Although there was evidence of mitigation in *State Farm*, *id.* at 426, the Court did not include mitigation as one of the factors in the reprehensibility analysis. Given such explicit guidance, this omission acquires particular significance and suggests we reconsider our prior statement about mitigation.[4] As explained below, upon reconsideration I find that including mitigation in the reprehensibility analysis is neither good law nor good policy.

Aside from a single mention of mitigation in *Punitive Damages I*, the majority's approach is supported by neither Supreme Court precedent nor our own precedent. The majority cites *Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir. 2001), as support, even though *Swinton*, like *Punitive Damages Opinion I*, was decided prior to *State Farm*. Therefore,

---

[4]The majority suggests *State Farm* is distinguishable because the dispute concerned an insurance contract rather than a toxic tort. *See ante* at 6048, 6068. However, the five-part reprehensibility analysis in *State Farm* is designed to evaluate a broad range of conduct, and nothing in the opinion indicates this framework applies only to insurance cases.

it did not have the benefit of the Supreme Court's most recent and comprehensive analysis of reprehensibility. Furthermore, *Swinton* did not consider whether mitigation warrants a reduction in a punitive damages award imposed by a jury. Rather, our analysis was limited to the question of whether the district court erred in excluding evidence of mitigation efforts in an employment discrimination suit. *See id.* at 811, 815. We refused in that case to create a generalized rule in the employment context or anywhere else. *See id.* at 814-15. Instead, we left it to the discretion of the district courts to decide the relevancy of mitigation efforts on a case-by-case basis.

We also expressly rejected the idea that the Supreme Court endorses the categorical relevance of mitigation in punitive damages calculations. *See id.* at 812 ("We do not interpret the language in *BMW* and *Cooper* as relying on evidence of post-occurrence remediation for overturning the punitive damages awards; rather the Court appears simply to have been recounting a full history of the litigation to give a complete picture of the proceedings."). While post-tort mitigation by a defendant may or may not be relevant to a jury's determination of whether and in what amount to award punitive damages, *Swinton* gives no support to the majority's position that mitigation is properly considered as part of the reprehensibility analysis in a constitutional review.

Additionally, the majority's approach makes little sense as a matter of policy, for it runs directly counter to the twin goals of punitive damages: deterrence and retribution. *See State Farm*, 538 U.S. at 416 ("[P]unitive damages serve a broader function; they are aimed at deterrence and retribution."); Theodore Eisenberg, *Damage Awards in Perspective*, 36 Wake Forest L. Rev. 1129, 1145 (2001) ("[A] wrongdoing party's voluntary—to the extent payments are truly voluntary after being 'caught'—remediation payment does not reduce the propriety of punishing or deterring."). While including mitigation in the reprehensibility analysis doubtlessly increases the incentive to remediate, it does so at the expense of under-

mining deterrence and retribution. The majority's approach minimizes deterrence by creating a post-tort means of limiting punitive damages. This allows potential tortfeasors to engage in risky behavior, safe in the knowledge they can minimize liability for any resulting harm by prompt payment of foreseeable damages. It also cripples the state's interest in retribution, as it allows the tortfeasor, rather than the jury, to recharacterize the reprehensibility of its misconduct after a tort has been committed. *Cf. Cooper*, 532 U.S. at 432 (recognizing that the "imposition of punitive damages is an expression of [the jury's] moral condemnation").

Nonetheless, the majority insists that including mitigation in the reprehensibility analysis is good public policy because it encourages socially beneficial conduct. *Ante* at 6076. A company in Exxon's position, however, already has significant incentives to clean up its mess. Had Exxon not taken prompt action to clean up the oil spill and compensate injured parties, *see ante* at 6047, the actual harm caused could well have exceeded the $504.1 million figure we use as the numerator in our ratio analysis. *See ante* at 6086. Specifically, if eleven billion gallons of oil were left indefinitely in Prince William Sound, and injured parties were without resources to start their lives anew, both economic and social harm would have grown. This would have increased Exxon's liability not only for compensatory damages, but also for punitive damages. Greater actual harm translates to a larger punitive damages numerator and a higher ceiling for the punitive damages award. Thus, mitigation is already reflected in the calculation of compensatory damages and in our constitutional review of the jury's punitive damage award.

Moreover, I am not convinced the majority's approach will ultimately encourage defendants to settle. *Cf. Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1229 (9th Cir. 1989) (noting there is an "overriding public interest" in promoting settlement). Instead, I fear it has the unintended consequence of giving tortfeasor defendants a way to reduce the risk of litigation

*without* reaching a settlement with injured parties. Under our past precedent, the threat of a significant punitive damages award created a strong incentive for defendants to pay injured parties in exchange for a release or similar arrangement.[5] The majority's approach, however, allows defendants to limit their exposure to punitive damages by taking unilateral steps, even token ones, to remediate harm. I am concerned this will frequently lead to more protracted litigation, as injured parties will not necessarily be satisfied with defendants' mitigation efforts, and defendants will have less incentive to reach settlement agreements. Thus, policy implications support the legal conclusion that it is not appropriate to add mitigation to the *State Farm* factors.

### (ii) State Farm *Factors*

Because I see no basis for the majority's inclusion of mitigation in our due process reprehensibility analysis, I consider only the five factors outlined by the Supreme Court. I agree with the majority that the first, second, and fourth factors[6]

---

[5]In this case, the certification of a mandatory punitive damages class meant that individual plaintiffs could not reduce the ultimate punitive damages award by releasing their claims. *See In re Exxon Valdez*, 229 F.3d 790, 793 (9th Cir. 2000) ("Claims for compensatory damages could be easily disposed of by exchanging payment for releases, but a plaintiff's release of its slice of the future lump-sum punitive damages award merely reduced the number of claimants sharing the punitive damages pie, not the size of the pie itself."). However, several plaintiffs nonetheless used the looming punitive damages award as a bargaining chip by allocating Exxon a portion of any award they might receive. *See ante* at 6051.

[6]I am not convinced by the majority's analysis of the third factor, but I do agree that it plays a relatively small role in this case and therefore does not warrant an extended discussion. The majority classified as neutral the third factor, whether "the target of the conduct had financial vulnerability," *see State Farm*, 538 U.S. at 419. As the majority admits, *ante* at 6075, by recklessly placing a "relapsed alcoholic in charge of a supertanker," Exxon knew that it was "imposing a tremendous risk on a tremendous number of people who could not do anything about it." Not only were many of those people "financially vulnerable" by virtue of being subsis-

suggest Exxon's conduct was highly reprehensible and capable of supporting a substantial award. However, I cannot agree with the analysis concerning the fifth factor, whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm*, 538 U.S. at 419. As the majority recognizes, Exxon's decision to put a relapsed alcoholic in charge of a supertanker constituted knowing and reckless misconduct, which was neither intentionally malicious nor a mere accident. *Ante* at 6075. However, faced with conduct that does not fit squarely in either category mentioned in *State Farm*, the majority arbitrarily determines this factor weighs against high reprehensibility because Exxon "did not spill the oil on purpose." *Id.*, at 6075. I cannot agree with this conclusion for two reasons.

First, if we read this *State Farm* factor to recognize only two categories of conduct, the fact that Exxon's acts fall in neither category could suggest this is a neutral factor, weighing neither for nor against high reprehensibility. However, if the majority is correct that we must determine whether Exxon's conduct is more similar to one category or the other,[7] I believe it is closer to "intentional malice, trickery, or deceit" than to "mere accident." *State Farm*, 538 U.S. at 419; *cf.* *Black's Law Dictionary* 968 (7th ed. 1999) (defining malice

---

tence fishermen, but they were also particularly vulnerable to the specific risk imposed on them by Exxon. *See In re Exxon Valdez*, 296 F. Supp. 2d at 1094-95. Thus, I would find this factor indeed suggests Exxon's reckless conduct was highly reprehensible. *See BMW*, 517 U.S. at 576 ("To be sure, infliction of economic injury, especially . . . when the target is financially vulnerable, can warrant a substantial penalty.").

[7]Contrary to the majority's assertion, *ante* at 6068, I do not suggest it views Exxon's conduct as a largely excusable accident. Rather, I note that in finding this factor "militates against viewing Exxon's misconduct as highly reprehensible," *ante* at 6076, the majority treats Exxon's reckless misconduct as it would treat an accident. This is not consistent with the majority's own statement that "the reprehensibility of Exxon's conduct that produced economic harm to thousands of individuals is high . . ." *Id.*

as, *inter alia*, "[r]eckless disregard of the law or of a person's legal rights"). The jury held Exxon responsible not merely for spilling oil, but rather for knowingly giving command of a supertanker "carrying over 53 million gallons of volatile, toxic, crude oil" to a relapsed alcoholic. *See In re Exxon Valdez*, 296 F. Supp. 2d at 1097. Exxon did so for three years with full knowledge of the tremendous risk of serious harm to the health, safety, and livelihood of many people. *See ante* at 6071-72. This cannot fairly be described as an accident. Given the extreme recklessness of Exxon's conduct, I would conclude the fifth factor militates in favor of finding Exxon's behavior highly reprehensible. *Accord Swinton*, 270 F.3d at 818 (holding that conduct which was, at most, reckless disregard for others' health and safety, easily "constitutes highly reprehensible conduct justifying a significant punitive damages award").

Thus, unlike the majority, I find that all five of *State Farm*'s reprehensibility factors suggest that Exxon's reckless conduct in this case—the malicious endangerment of the property and livelihood of thousands of Alaskans—was highly, if not extremely, reprehensible and capable of "warrant[ing] a substantial penalty." *See BMW*, 517 U.S. at 576.

### (b)   Ratio

Under the second *BMW* guidepost, we must analyze "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." *See id.* at 418. While I agree with the majority's "calculation of harm," or "numerator," analysis, *ante* at 6087, I cannot agree with its conclusion, *id.* at 6089, that the Constitution prohibits a ratio in this case above 5 to 1. The majority arrives at this constitutional limit through two steps. First, it uses the "rough framework" of *Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 422 F.3d 949 (9th Cir. 2005), to arrive at the conclusion that the appropriate ratio in this case is above 4 to 1, but no greater than 9 to 1. *Ante* at

6087-88. However, it then asserts the proper ratio cannot be much greater than 4 to 1 because Exxon's conduct was not intentional and because Exxon attempted to mitigate the harm it caused. *Ante* at 6088. I cannot agree with this.

In *Planned Parenthood*, we established a three-tiered "rough framework" to guide us in determining an appropriate ratio.[8] Applying *Planned Parenthood* to this case, the majority concludes a 4 to 1 benchmark is appropriate based on its determination that the economic damages are "significant." *Ante* at 6087-88. As an initial matter, the majority's assessment of economic damages focuses on a number devoid of its context. An award is significant not because it is numerically large, but rather because it approaches full compensation for the plaintiff's harms. *See State Farm*, 538 U.S. at 426 ("The compensatory award in this case was substantial; [the plaintiffs] were awarded $1 million for a year and a half of emotional distress. This was complete compensation."). I am not convinced that a compensatory damages award that equates to a mere $10,000 per plaintiff is actually "substantial" in the way the Supreme Court uses the term. *Cf. id.* at 425 (providing, as an example of "small" economic damages, cases where the injury was hard to detect or not fully economic in nature).

Even if the majority were correct that the economic damages awarded in this case are "significant," *Planned Parenthood* still does not support a 4 to 1 benchmark in this case. In *Planned Parenthood*, we refused to remit the award to less than a 9 to 1 ratio because not all of the plaintiff's damages were quantifiable, not all of it was compensated, and the

---

[8]Where the economic damages are significant but the behavior not "particularly egregious," a ratio of less than 4 to 1 is warranted. *Planned Parenthood*, 422 F.3d at 962. If the economic damages are significant but the behavior "more egregious," a ratio greater than 4 to 1 might be acceptable. *Id.* Finally, if the economic damages are insignificant but the behavior is "particularly egregious," ratios beyond single digits may be appropriate. *Id.*

plaintiffs were likely to incur further costs. 422 F.3d at 963. All three are true here as well. The oil spill disrupted the social fabric of the plaintiffs' community. *See In re Exxon Valdez*, 296 F. Supp. 2d at 1094. This type of harm is not easily quantifiable. Moreover, the plaintiffs' recovery in this case was limited to economic harm. It therefore did not compensate the plaintiffs for harm attributable to increased "social conflict, cultural disruption and psychological stress." *Id.* Finally, there is evidence the plaintiffs have incurred substantial further costs. *See id.* Thus, it cannot be said the compensatory damages in this case are so large or sufficiently comprehensive they warrant a lower punitive damages award.

Nor, in my mind, does the majority find support in *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003), or *Bains LLC v. Arco Products Co.*, 405 F.3d 764 (9th Cir. 2005). That we upheld an award in the 7 to 1 range in *Zhang*, and remanded for a similar award in *Bains*—both for intentional racial discrimination in the employment context— says little if nothing about the constitutionality of this award for the reckless endangerment of the property and livelihood of tens of thousands of people. While it is true any given conduct is more reprehensible if intentional than if reckless, it does not necessarily follow that all intentional conduct is more reprehensible than all reckless conduct. Indeed, because we are the first court to review an award for misconduct resulting in harm of the type and scale at issue here, I find it unhelpful to note that our cases to date "have generally reserved high single-digit ratios for the most egregious forms of intentional misconduct, such as threats of violence and intentional racial discrimination." *See ante* at 6088. Instead, every indicator in this case suggests that Exxon's reckless conduct—leaving for three years a known alcoholic in command of a supertanker in treacherous waters upon which thousands of people depend— is egregious enough to support an award within the 9 to 1 range. *Accord Swinton*, 270 F.3d at 818-20 (upholding a 28 to 1 ratio despite recognizing that the conduct at issue involved no acts or threats of violence and,

therefore, "[did] not amount to the worst kind of tortious conduct a defendant can commit").

One final consideration convinces me that the 8.93 to 1 ratio in this case does not indicate that Exxon has been subject to a "grossly excessive" punitive damages award. In *State Farm*, the Supreme Court reiterated that it is appropriate to consider for purposes of ratio calculation not only the actual harm caused, but the potential harm that a defendant's misconduct could have foreseeably caused. *See* 538 U.S. at 418 (describing the second guidepost as requiring consideration of "the actual *or* potential harm suffered" (emphasis added) (citing *BMW*, 517 U.S. at 575)); *accord TXO*, 509 U.S. at 460 ("Taking account of the potential harm that might result from the defendant's conduct in calculating punitive damages was consistent with the views we expressed in *Haslip*." (internal citation omitted)). As the majority recognizes, *ante* at 6071-72, the potential harm from Exxon's decision to keep Hazelwood in command of the *Exxon Valdez* was both massive and foreseeable. But despite the propriety of such consideration, the calculation of harm in this case explicitly incorporates only an estimate of actual, and not of potential, harm. *See In re Exxon Valdez*, 296 F. Supp. 2d at 1103; *ante* at 6087. Thus, if anything, the jury's punitive damages award potentially undervalued the harm.

### *Conclusion*

In accordance with *State Farm* and its predecessors, we are required to subject this award to "exacting [de novo] appellate review" in order to ensure it is "based upon an application of law, rather than a decisionmaker's caprice." *See* 538 U.S. at 418 (internal quotation marks omitted) (quoting *BMW*, 517 U.S. at 587 (Breyer, J., concurring)). But that review does not empower us to substitute our own, perhaps more finely-tuned, award for one that was fairly awarded and already lies within the range of constitutional awards. *See BMW*, 517 U.S. at 583

(noting that most awards fall within a "constitutionally acceptable *range*" (emphasis added)).

After thorough and concerned analysis of this punitive damages award, I conclude that its imposition does not violate Exxon's constitutional right to due process. The award was levied as a result of fair procedure and in pursuit of the undisputedly strong, and properly circumscribed, state interests in punishing Exxon for its misconduct, and in deterring any similar behavior by Exxon in waters it continues to frequent. While the award is large, it addresses what must be characterized as extremely reprehensible misconduct. There is simply no excuse for allowing a relapsed alcoholic to pilot a supertanker in any waters, much less for three years in the treacherous and treasured waters of Prince William Sound. Exxon's knowing decision to do so was a malicious one that placed at massive risk, and ultimately seriously injured, the property and livelihood of tens of thousands of Alaskans. There is every indication the award before us reasonably addresses that egregious behavior, and nothing in the record that suggests it resulted from passion, bias, or caprice. I therefore agree with the district court's assessment that there is no principled means by which this award should be reduced. *See In re Exxon Valdez*, 296 F. Supp. 2d at 1110. Accordingly, and with respect, I dissent.